

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-24-1999

# McClintock v. Eichelberger

Precedential or Non-Precedential:

Docket 98-3443

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"McClintock v. Eichelberger" (1999). *1999 Decisions.* Paper 79.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/79

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 24, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-3443

JON MCCLINTOCK;
CHERRYHILL ASSOC. INC.,

        Appellants

v.

JOHN EICHELBERGER; BRAD COBER;
ALEXA FULTZ; ROBERT WILL; JOHN EBERSOLE;
SOUTHERN ALLEGHENIES PLANNING AND
DEVELOPMENT COMMISSION

On Appeal from the United States District Court
for the Western District of Pennsylvania
District Judge: Honorable D. Brooks Smith
(D.C. Civ. No. 97-00297)

Argued February 17, 1999

BEFORE: GREENBERG, ROTH, and LOURIE,*
Circuit Judges

(Filed: March 24, 1999)

_____

*Honorable Alan D. Lourie, Circuit Judge of the United States Court of
Appeals for the Federal Circuit, sitting by designation.

    Daniel M. Berger
    Paul A. Lagnese (argued)
    Berger Law Firm
    The Frick Building
    Suite 912
    Pittsburgh, PA 15219

     Attorneys for Appellants

    Robert L. McTiernan (argued)
    Tucker Arensberg, P.C.
    1500 One PPG Place
    Pittsburgh, PA 15222

     Attorneys for Appellees

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. INTRODUCTION

This matter is before this court on an appeal from an order entered in the district court on July 28, 1998, granting the appellees' motion pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the first amended complaint in this case for failure to state a claim on which relief may be granted. The case arises principally under the First Amendment to the United States Constitution, applicable to the states through incorporation under the Fourteenth Amendment. See Gitlow v. New York, 268 U.S. 652, 666, 45 S.Ct. 625, 629 (1925). In addition, appellants have set forth a supplemental state-law claim. We are concerned here with the First Amendment's impact on the awarding of a governmental contract. In view of the procedural posture of this case we accept the appellants' factual allegations as true and view them in the light most favorable to appellants. See Smith v. National Collegiate Athletic Ass'n, 139 F.3d 180, 183 (3d Cir. 1998), rev'd on other grounds, 119 S.Ct. 924 (1999).

Appellants, Jon McClintock and Cherryhill Associates, Inc., brought this action against appellees John Eichelberger, Jr., Brad Cober, Alexa Fultz, Robert Will, John Ebersole, and Southern Alleghenies Planning and Development Commission. Appellants assert that McClintock at all times relevant to this action was engaged in the business of marketing and advertising through Cherryhill, a Pennsylvania corporation, in which he is the principal shareholder. The individual appellees are commissioners of Blair, Somerset, and Huntington Counties, Pennsylvania, and as such are members of the Executive Board of the appellee, Southern Alleghenies Planning and Development Commission which, according to the appellants, "is a corporation or other entity existing under the laws of the Commonwealth of Pennsylvania." Notwithstanding that imprecise characterization, it is undisputed that Southern Alleghenies is a public entity. Appellants allege that Southern Alleghenies at all times relevant "was engaged in developing the business and industries of the Counties of Bedford, Blair, Cambria, Somerset, Huntingdon and Fulton."

The complaint alleges that beginning in 1985 appellants and Southern Alleghenies "developed an ongoing business relationship . . . as independent contractors," meaning that appellants have been independent contractors engaged by Southern Alleghenies to perform services. In particular, the complaint alleges that in 1985 Southern Alleghenies retained McClintock to coordinate the promotion of its "Seatbelt Safety Demonstration Project" and in 1992 Southern Alleghenies retained Cherryhill "to coordinate providing promotional materials and advertising for the 1992 United States Olympic Cycle Trials which was coordinated by" Southern Alleghenies. Appellants allege that they performed their services to the satisfaction of Southern Alleghenies.

The final particularized allegation constituting this "ongoing business relationship" is that "[i]n the years of 1995, 1996 and 1997, . . . Southern Alleghenies purchased various promotional materials from . . . Cherryhill such as magnets, vinyl banner and bags and specially imprinted `Slinkies.' " It thus appears that the"ongoing business

3

relationship" between appellants and Southern Alleghenies consisted of one contract in 1985 performed by McClintock as an independent contractor, one contract in 1992 performed by Cherryhill as an independent contractor, and a vendor-vendee relationship between Cherryhill and Southern Alleghenies from 1995 through 1997 involving the sale of promotional materials.

The appellants next alleged that because of their "ongoing relationship" Southern Alleghenies requested Cherryhill "to submit a proposal . . . to perform marketing services in connection with [its] TEAM PA Initiative. The marketing campaign proposed by . . . Cherryhill was designed to make companies in the six county area aware of a survey process being conducted prior to interviewers contacting businesses to set up interview dates." Of course, appellants allege that Cherryhill's proposal provided for Southern Alleghenies to pay Cherryhill "for the services to be performed under the marketing contract."

Appellants allege that the TEAM PA Initiative was a "coordinated effort" between Southern Alleghenies and certain otherwise unidentified "Industrial Development Corporations." The Industrial Development Corporations reviewed Cherryhill's proposal as well as those from other firms and "unanimously agreed to award the marketing contract to . . . Cherryhill." Appellants allege that on May 21, 1997, the Finance Committee of Southern Alleghenies approved awarding the contract to Cherryhill following which the contract was presented to the Southern Alleghenies Executive Board for final approval.

Appellants allege that appellee "Eichelberger stated his opposition to awarding the contract to . . . Cherryhill because [appellants] had supported and performed services for public officials and political candidates who [Eichelberger] opposed." The other individual appellees agreed with Eichelberger. As a result of the vote of the five individual appellees "constituting a majority of the Executive Board" it defeated a motion to award the contract to Cherryhill. The Executive Board by the same vote then awarded the contract to another concern. While the complaint is unclear on this point, we infer that the Executive Board must have more than five members and

4

that some of the members favored awarding the contract to Cherryhill.

Appellants alleged that appellees did not award the contract to Cherryhill because appellants:

> in the exercise of their rights under the First and Fourteenth Amendments, had supported and performed services for various public officials and political candidates who were opposed by Defendant Eichelberger and some or all of the other individual Defendants, or, in the alternative, Defendant Eichelberger opposed said public officials and political candidates and the other individual Defendants supported Defendant Eichelberger in denying the marketing contract to Plaintiff Cherryhill, with said other individual Defendants knowing that Defendant Eichelberger's oppositions was based upon Plaintiffs' support of said public officials and political candidates.

Appellants alleged that by reason of their "long, ongoing and satisfactory business relationship" with Southern Alleghenies and the approval of their proposal by the Industrial Development Corporations "acting as the TEAM PA Advisory Committee" as well as by Southern Alleghenies' Finance Committee, they "had the expectation that the marketing contract would be awarded to . . . Cherryhill." Thus, they alleged that the appellees acting under color of state law in violation of 42 U.S.C. S 1983 penalized them from exercising "their rights of free speech and assembly, as guaranteed by the First and Fourteenth Amendments . . . by supporting and working for public officials and political candidates of their choice." Appellants also asserted that the facts they alleged constituted the state-law tort of interference with "the advantageous relationship between . . . Cherryhill and . . . Southern Alleghenies." Appellants sought compensatory and punitive damages. The district court had jurisdiction over appellant's complaint under 28 U.S.C. S S 1331, 1343(a), and 1367.

As we have indicated, the appellees moved to dismiss under Fed. R. Civ. P. 12(b)(6). The district court granted the motion in its memorandum and order of July 28, 1998. In its memorandum the district court set forth the

5

background of the case and then indicated that in Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673 (1976), "the Supreme Court recognized that a public employee who alleges that he was discharged or threatened with discharge solely because of his partisan political affiliation or nonaffiliation states a viable claim under [42 U.S.C.] S 1983 that his First Amendment rights have been violated." The district court then indicated that in Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287 (1987), the Supreme Court confirmed the Elrod holding that patronage dismissals are unconstitutional unless political affiliation is an appropriate requirement for the effective performance of the public office involved. The district court next said that in Rutan v. Republican Party of Illinois, 497 U.S. 62, 110 S.Ct. 2729 (1990), the Supreme Court extended Elrod and Branti by holding that those cases applied "to promotion, transfer, recall, and hiring decisions based on party affiliation and support." Id. at 79, 110 S.Ct. at 2739.

The district court then addressed two Supreme Court cases which, like this one, involved not employees, but independent contractors, Board of County Comm'rs v. Umbehr, 518 U.S. 668, 116 S.Ct. 2342 (1996), and O'Hare Truck Serv., Inc. v. City of Northlake, 518 U.S. 712, 116 S.Ct. 2353 (1996). The district court pointed out that in Umbehr and O'Hare the Court held that a government may not terminate an independent contractor's relationship to retaliate against the contractor for the exercise of his rights to political allegiance or political association. The district court noted, however, that Umbehr and O'Hare involved situations in which there had been ongoing commercial relationships between the public entity and the independent contractor. In fact, Umbehr and O'Hare respectively involved trash hauling and motor vehicle towing, municipal services of an ongoing character.

The district court indicated that appellants were not in the same position as the plaintiffs in Umbehr and O'Hare as Cherryhill "was no more than a bidder or applicant for a new government contract." Moreover, the district court, in declining to find a sufficient allegation of a First Amendment violation in the complaint, made reference to the Supreme Court's caveat at the end of Umbehr :

6

> Finally, we emphasize the limited nature of our
> decision today. Because Umbehr's suit concerns the
> termination of a pre-existing commercial relationship
> with the government, we need not address the
> possibility of suits by bidders or applicants for new
> government contracts who cannot rely on such a
> relationship.

Umbehr, 518 U.S. at 685, 116 S.Ct. at 2352. The district
court indicated that while the Supreme Court might extend
the Elrod, Branti, and Rutan "jurisprudence to the claims of
disappointed bidders and applicants," it would not do so.

The district court ended its opinion by dismissing
appellants' state law claims. In this regard it pointed out
that in Pennsylvania there cannot be a tortious interference
with a contract unless three parties are involved, a
tortfeasor, a plaintiff and a third party with whom the
plaintiff is contracting. See Maier v. Maretti, 671 A.2d 701,
707 (Pa. Super. 1995). Thus, the appellees could not be
liable as the germane contract was with them.
Furthermore, the result was not affected by reason of the
fact that the individual appellees were officers or agents of
Southern Alleghenies. See Daniel Adams Assocs., Inc. v.
Rimbach Publ'g Co., 519 A.2d 997, 1000-02 (Pa. Super.
1987). The district court then entered the order of July 28,
1998.

Appellants appeal from the order of July 28, 1998. We
have jurisdiction under 28 U.S.C. S 1291 and exercise
plenary review on this appeal. Thus, we can affirm only if
we are certain that the appellants cannot prove any set of
facts under the first amended complaint which would be
the basis for relief. See Smith, 139 F.3d at 183.

II. DISCUSSION

Initially we identify the precise issue before this court. As
we have indicated, the Supreme Court in Umbehr  carefully
limited its opinion to holding that there was a First
Amendment protection of pre-existing commercial
relationships while reserving decision on whether there is
similar protection for bidders or applicants for new
government contracts who cannot rely on such a

7

relationship. Appellants pleaded their case within the Umbehr framework and thus the district court principally adjudicated the case on that basis. Accordingly, the gravamen of the district court's opinion is that this case is distinguishable from Umbehr and O'Hare because appellants cannot claim the "status" of being in a "pre-existing commercial relationship with Southern Alleghenies."

The district court surely was correct in reaching this conclusion. In O'Hare the municipality had a list of tow truck operators which had included the plaintiff for many years. During a political campaign he declined to make a contribution to the incumbent mayor following which, allegedly in retaliation for that refusal, the municipality removed him from the list, thereby terminating a long term relationship. In Umbehr the plaintiff was a trash hauler who frequently criticized the county government which engaged him. Umbehr brought suit charging that the county terminated his contract in retaliation for his speech. In Umbehr, as in O'Hare, the retaliation terminated an active ongoing independent contractor relationship for the supplying of governmental services.

This case, however, is very different from Umbehr and O'Hare. Notwithstanding the appellants' pleading that they have had "an ongoing business relationship" with Southern Alleghenies since 1985, the facts which they have pled make it clear that the relationship is distinguishable from those in Umbehr and O'Hare. Here appellants had two prior contracts with Southern Alleghenies for discrete services, the 1985 seatbelt project and the 1992 project coordinating the provision of promotional materials and advertising for the Olympic cycle trials. In addition, Cherryhill as a vendor supplied promotional materials to Southern Alleghenies.

Appellants do not allege that the contract for marketing services in connection with the TEAM PA Initiative involved here is related in any way to their prior contracts with Southern Alleghenies. Thus, their status differs from that of the plaintiffs in Umbehr and O'Hare who were providing ongoing services when the public entities terminated their relationship in retaliation for their political activities. We therefore conclude that with respect to the TEAM PA

8

Initiative, this action does not "concern[ ] the termination of a pre-existing commercial relationship with the government." Umbehr, 518 U.S. at 685, 116 S.Ct. at 2352. Rather, this case involves a "suit[ ] by[a] bidder[ ] or applicant[ ] for [a] new government contract[ ] who cannot rely on such a relationship." Id.

Our analysis leads us to affirm the order of the district court for each of two independent reasons, one procedural and one substantive, either of which alone requires our result. The procedural reason is that appellants pled this case in the district court relying on their ongoing relationship with Southern Alleghenies and thus the viability of their claim depends on their ability to demonstrate that they had such a relationship. While we recognize that the appellants in their district court brief in opposition to appellees' motion to dismiss stated that if the court found that they did not have the same status as the plaintiffs in Umbehr and O'Hare, they nevertheless were entitled to First Amendment protection from retaliation, this argument went beyond the pleadings.

On this appeal appellants continue to focus on their previous relationship with Southern Alleghenies. Thus, they summarize their First Amendment argument as follows:

> Cherryhill and McClintock were regular providers of services to Southern Alleghenies and had an existing commercial relationship with Southern Alleghenies. As such Cherryhill and McClintock were entitled to protection from retaliation for exercise of their right to political expression. Thus, Southern Alleghenies' failure to award a contract to Cherryhill solely because Cherryhill and McClintock had worked for supported and worked for political opponents of Eichelberger states a claim for which relief can be granted. Accordingly, the district court erred in granting Southern Alleghenies' Motion to Dismiss the First Count of the First Amended Complaint.

Br. at 9.

In their brief in this court appellants once again contend that "[e]ven assuming that this Court finds that [they] do not have the same status as the plaintiffs in Umbehr and

9

O'Hare, [they] are nonetheless entitled to protection, from government retaliation for exercise of their First Amendment rights." Br. at 15. We, however, will not entertain this argument as appellants did not plead it as the basis for relief in their complaint. See Krouse v. American Sterilizer Co., 126 F.3d 494, 499 n.1 (3d Cir. 1997). Accordingly, we will affirm the order of the district court for, as we already have indicated, the appellants do not have an ongoing relationship with Southern Alleghenies entitled to First Amendment protection under Umbehr and O'Hare.

In any event, even if we entertained appellants' argument that without regard for their status under Umbehr and O'Hare they are entitled to relief, we would affirm. In reaching this result we understand that under Rutan certain applicants for public employment are entitled to First Amendment protection and that Umbehr indicated that "[i]ndependent government contractors are similar in most relevant respects to government employees." 518 U.S. at 684, 116 S.Ct. at 2352. Nevertheless, the Court in Umbehr "emphasize[d] the limited nature of [its] decision" and thus did "not address the possibility of suits by bidders or applicants for new government contracts who cannot rely on such a relationship." Id. at 685, 116 S.Ct. at 2352. The Court therefore carefully cabined its decision.

In Horn v. Kean, 796 F.2d 668, 678 (3d Cir. 1986) (in banc), we cautioned against extending First Amendment holdings if they would cause the judiciary to "intrude itself into such traditional practices as contract awards by the government's executive, be it on a federal, state or local level." Thus, we suggested that if expansion in the area is to come the source should be the Supreme Court. Id. While the substantive holding in Horn does not survive the later Supreme Court cases we have cited, still Horn's admonition remains true. Certainly it is difficult for a court to predict what the consequences would be on political activity if the First Amendment protections are extended beyond the Umbehr and O'Hare boundaries. Perhaps the extension even would discourage political activity.

On the other hand, retaliation in a situation involving ongoing contracts obviously presents a clear set of

10

dynamics. Protection of an independent contractor with a pre-existing commercial relationship with the public entity from retaliation by reason of his political activity plainly protects his First Amendment rights. Accordingly, there is a principled reason to limit Umbehr and O'Hare to situations in which, unlike the one here, the retaliatory act is the termination of an ongoing commercial relationship.

The final issue before us involves appellants' state law supplemental claim. We see no reason to discuss this claim on the merits as we agree with the district court's dismissal of it and have nothing to add to its analysis. We, however, point out that the appellants do not contend that the district court abused its discretion in exercising jurisdiction over this claim. See 28 U.S.C. S 1367(c).

III. CONCLUSION

For the foregoing reasons, we will affirm the order of July 28, 1998.

ROTH, Circuit Judge, Dissenting:

The majority's decision to affirm the dismissal of the appellants' statutory claim turns on two assumptions, both of which relate to McClintock's and Cherryhill's status as independent contractors. The first assumption critical to the outcome reached by the majority is its factual determination that McClintock and Cherryhill did not have a "pre-existing commercial relationship" with Southern Alleghenies. Majority Op. at 7, [typescript at 9-10] The second is the majority's conclusion that, without such a pre-existing commercial relationship, the appellants cannot assert a claim under 42 U.S.C. S 1983 based on the appellees' failure to grant them a public contract for allegedly partisan reasons. Majority Op. at 7-8,[typescript at 9]. For the reasons set forth below, I find that the Supreme Court's First Amendment jurisprudence does not support the kind of status-based limitation on individuals' rights of political expression and association that the majority's decision endorses.1 Therefore, I respectfully dissent from the majority's decision to affirm the District Court's dismissal of the appellants' S 1983 claim.

The majority's understanding of the constitutional significance of the appellants' status as independent contractors rests primarily on language from Board of County Comm'rs v. Umbehr, 518 U.S. 668 (1996). This understanding arises from two sentences that appear in the penultimate paragraph of the opinion. The Supreme Court writes: "Finally we emphasize the limited nature of our decision today. Because Umbehr's suit concerns the termination of a pre-existing commercial relationship with the government, we need not address the possibility of suits by bidders or applicants for new government contracts who cannot rely on such a relationship." Id. at 685. The majority reads this language as categorically restricting claims by

_____

1. The majority also concludes that, before the District Court, appellants relied solely on the theory that they had an on-going relationship with Southern Alleghenies. Because, however, the District Court found that appellants were not regular providers of services and, therefore, not entitled to Elrod and Branti protection, I conclude that the issue, as I set
it out above, is fairly before this Court.

independent contractors, who allege that partisanship improperly influenced the awarding of a public contract, to those independent contractors who can demonstrate a business relationship with the government prior to the alleged unconstitutional incident.

The majority's reliance on this language regarding a "pre-existing commercial relationship" is misplaced. This language is dictum. More importantly, the majority's emphasis upon it diminishes the central proposition for which Umbehr stands: namely, the Court's "recogni[tion] [of ] the right of independent contractors not to be terminated for exercising their First Amendment rights." Id. at 685; see also O'Hare Truck Serv. v. City of Northlake, 518 U.S. at 723-26.

Moreover, the majority's emphasis on this language obscures the relevance of the many cases in which the Court has considered the First Amendment rights of government employees. E.g. Rutan v. Republican Party of Illinois, 497 U.S. 62 (1990); Branti v. Finkel, 445 U.S. 507 (1987); Mount Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274 (1977); Elrod v. Burns, 427 U.S. 347 (1976); Perry v. Sindermann, 408 U.S. 593 (1972); Pickering v. Board of Educ., 391 U.S. 563 (1968); Keyishian v. Board of Regents, 385 U.S. 589 (1967). In these cases, the Court made clear that the "unconstitutional conditions" doctrine extends to government employees. See Perry, 408 U.S. at 597 ("[The government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests-- especially his ... freedom of speech."); Rutan, 497 U.S. at 72-75 (holding that hiring, promotions, transfers, and recalls of low-level public employees based on partisan affiliation or association violate the First Amendment); Branti, 445 U.S. at 518 (holding that public defender could not discharge assistants because of their political affiliation without violating the First Amendment); Elrod, 427 U.S. at 351 (holding that sheriff 's discharge of non-civil service office staff because of their political affiliation violated the First Amendment). The only exception to this rule is when political affiliation is a reasonably appropriate requirement for the job in question. See e.g. Pickering, 391 U.S. at 568- 74 (establishing fact-sensitive and deferentially

13

administered balancing test for determining if government's interests are sufficiently compelling to overcome public employees' First Amendment rights).

None of these cases state, or reasonably should be taken to imply, that the ability of independent contractors to bring suit against governmental employers for violation of their First Amendment rights is categorically distinct from that of government employees. Rather, this precedent leads logically to the conclusion that independent contractors, like government employees, may not be disfavored by state actors in the employment process on grounds that offend the First Amendment. As best understood under the present state of the law, independent contractors enjoy essentially the same right to sue as do employees of the government who claim to have been denied employment for partisan reasons. Established in O'Hare, 518 U.S. at 723–26, and Umbehr, 518 U.S. at 674–76, the rule that independent contractors may not be discharged by government employers for exercising their First Amendment Rights evolved directly from the line of cases, cited supra, in which the Court considered the First Amendment rights of government employees. See e.g. Umbehr, 518 U.S. at 674–77 (discussing government employee cases); O'Hare, 518 U.S. at 718–21 (same).

In O'Hare and Umbehr the Court explained that it was extending the rule established in the government employee cases to actions involving independent contractors because it found no difference of "constitutional magnitude" between these two categories of workers. See Umbehr, 518 U.S. at 679 (quoting Leftkowitz v. Hurley, 414 U.S. 70, 83 (1973); O'Hare, 518 U.S. at 722 (same). For the purpose of determining if the First Amendment restricts the freedom of governments to terminate their relationships with independent contractors, the Court found the similarities between government employees and government contractors "obvious"; moreover, it found the"threat of loss" the same to each in the event of governmental retaliation on grounds that violate their right to free expression. Umbehr, 518 U.S. at 674; accord O'Hare, 518 U.S. at 721–23. "Because of these similarities," the Court looked to the government employee precedents "for

14

guidance," Umbehr, 518 U.S. at 674, and "appl[ied] ... the existing framework for government employees cases to independent contractors." Id. at 677.

To the extent that salient differences between these classes of workers exist in individual cases, the Umbehr Court found "no reason to believe that proper application of the Pickering balancing test cannot accommodate" them. Id. at 678. As a result, the Court rejected a brightline rule distinguishing the rights of independent contractors and employees because "whether state law labels a government service provider's contract as a contract of employment or a contract for services" is "at best a very poor proxy for the interests at stake." Umbehr, 518 U.S. at 679; see also O'Hare, 518 U.S. at 722 ("We can see no reason ... why the constitutional claim here should turn on the distinction [between independent contractors and employees], which is, in the main, a creature of the common law of agency and torts."). Because "such formal distinctions ... can be manipulated largely at the will of the government," the Court rejected the idea of determining constitutional claims on the basis of them. Umbehr, 518 U.S. at at 679 (citing Logue v. United States, 412 U.S. 521, 532 (1973)). "Independent contractors, as well as public employees, are entitled to protest wrongful government interference with their rights of speech and association," the O'Hare Court stated. 518 U.S. at 723. Thus, contrary to the reasoning of the majority and the result it reaches in this case, the Court expressly has stated the view that independent contractors should be treated the same as employees of the government for purposes of First Amendment analysis.

Consequently, while it is true that the Court has not explicitly addressed the nature of independent contractors' right to sue on First Amendment grounds when they are considered applicants for new contracts, rather than as having pre-existing business relationships with the government, the inference to be drawn from Umbehr and O'Hare is clear. Given these holdings and the reasoning that the Court employed in reaching them, it is logical to conclude that all independent contractors fall within the standard set forth in Umbehr, in O'Hare, and in the government employee cases. The opposite inference, that

15

this precedent should be understood to bar suits by contractors who are applicants for new contracts, is not logical.

The propriety of the inference that I suggest is inescapable in light of Rutan, 497 U.S. at 66–68, the case in which the Court considered whether hiring, promotions, transfers, and recalls based on government employees' political affiliation or support could be considered impermissible infringements on their First Amendment rights. The Court answered this question in the affirmative, id. at 74–77, thereby extending the rule established in Branti, 445 U.S. at 518, and Elrod, 427 U.S. at 351, relating to politically motivated terminations. In so doing, the Court rejected the argument that hiring, promotions, transfers, and recalls were "different in kind" from the terminations involved in Elrod and Branti because, it reiterated, the law is clear that entitlement to employment is immaterial to a government employee's First Amendment claim. Rutan, 497 U.S. at 71–72 ("For at least a quarter-century, this Court has made clear that even though a person has no `right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit ... on a basis that infringes his ... interest in freedom of speech.") (citing Perry, 408 U.S. at 596–98). In this way, the Court rejected the argument that an alleged impermissible infringement upon an employee's First Amendment right must occur in the form of a "substantial equivalent of dismissal." Id. at 75. "[T]here are deprivations less harsh than dismissal that nevertheless press state employees and applicants to conform their beliefs ... to some state-selected orthodoxy," the Court found. Id. (emphasis added). In my judgment, the fact that the Court expressly held that the same concerns that animated the rules in Elrod and Branti, regarding terminations, were present with respect to hiring in Rutan undermines the logic embraced by the majority. Id. at 78 ("Under our sustained precedent, conditioning hiring decisions on political belief and association plainly constitutes an unconstitutional condition, unless the government has a vital interest in doing so.").

16

Ultimately, it may be difficult for independent contractors like McClintock and Cherryhill to prove that the government violated their First Amendment rights during the employment process. This is so because a public employee who makes such a claim bears the burden of demonstrating that the alleged violation was a motivating factor in his failure to attain a contract. See Mount Healthy, 429 U.S. at 283-87. This burden would appear more difficult to discharge in cases where a contractor has not had an on-going relationship with the government, prior to applying for a contract. This matter is, however, one to be resolved by the trial courts. The point here is that the government is not entitled per se to a denial of liability simply because an independent contractor, who makes such a claim, is bidding on a new contract. See Umbehr, 518 U.S. at 678.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

17