RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0013P (6th Cir.)
File Name: 02a0013p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

LAC VIEUX DESERT BAND OF
LAKE SUPERIOR CHIPPEWA
INDIANS,
      *Plaintiff-Appellant,*

      *v.*

THE MICHIGAN GAMING
CONTROL BOARD; THE CITY
OF DETROIT; ATWATER
ENTERTAINMENT
ASSOCIATES, L.L.C.;
GREEKTOWN CASINO, L.L.C.,
      *Defendants-Appellees.*

No. 00-1879

Appeal from the United States District Court
for the Western District of Michigan at Marquette.
No. 97-00067—Robert Holmes Bell, Chief District Judge.

Argued: April 24, 2001

Decided and Filed: January 11, 2002

1

Before:  MARTIN, Chief Judge; MOORE, Circuit Judge;
        O'MALLEY, District Judge.[*]

—————————

**COUNSEL**

**ARGUED:**    G. Michael Fenner, CREIGHTON UNIVERSITY SCHOOL OF LAW, Omaha, Nebraska, for Appellant.  Morley Witus, BARRIS, SOTT, DENN & DRIKER, Detroit, Michigan, for Appellees.  **ON BRIEF:** Conly J. Schulte, MONTEAU & PEEBLES, Omaha, Nebraska, for Appellant.  Morley Witus, BARRIS, SOTT, DENN & DRIKER, Detroit, Michigan, Bruce R. Greene, Boulder, Colorado, John D. Pirich, John S. Kane, HONIGMAN, MILLER, SCHWARTZ & COHN, Lansing, Michigan, for Appellees.

MARTIN, C. J., delivered the opinion of the court, in which MOORE, J., joined.  O'MALLEY, D. J. (pp. 8-13), delivered a separate dissenting opinion.

—————————

**OPINION**

—————————

BOYCE F. MARTIN, JR., Chief Judge.  Upon the legalization of gambling in Detroit, the City enacted an ordinance establishing how it would issue three licenses for the operation of its new casinos.  Everyone interested in this opportunity should have been allowed to compete for it on the same terms. The ordinance instead incorporated an advantage for two companies that had been active in the movement to legalize the gambling in the first place.  Because Detroit based the advantage on that activity, and thereby penalized

—————————

[*] The Honorable Kathleen M. O'Malley, United States District Judge for the Northern District of Ohio, sitting by designation.

potential applicants who did not engage in it themselves, we hold that the ordinance in its current form is unconstitutional.

## I.

Defendants Atwater Entertainment Associates and Greektown Casino organized petition drives to lift Michigan's ban on off-reservation gambling. First, they helped place two initiatives on the Detroit city ballot that, in tandem, would authorize casinos within the city limits so long as voters statewide approved as well. When the Detroit initiatives passed, Atwater and Greektown proceeded to organize the necessary statewide referendum, widely known as "Proposal E." Proposal E also passed. As a result, casino gambling in Detroit became legal.

Next, the Michigan state legislature passed the Michigan Gaming Control and Revenue Act, permitting the mayor of Detroit to choose three casino licensees. The city's related ordinance, the subject of this case, governed the mayor's selections. In numerous respects, the ordinance rewards Atwater and Greektown for their efforts during the state and local referenda campaigns. For example, the ordinance includes a "statement of intent" declaring that "it is in the best interest of the City to provide a preference to those developers who took the initiative to facilitate the development of casino gaming in the City of Detroit by proposing a casino gaming proposal approved by the voters of the City, and who actively promoted and significantly supported the State initiative authorizing gaming." Detroit City Code, § 18-13-1(i). Another portion expressly prefers casino developers who, assuming they meet the other eligibility criteria, were "initiator[s] of a casino gaming proposal which was approved by the voters of this City prior to January 1, 1995; and . . . made significant contributions to the development of gaming within the City by actively promoting and significantly supporting a state initiative authorizing gaming." Detroit City Code, § 18-13-6(a)(2). Unsurprisingly, the mayor ultimately

awarded Atwater and Greektown two of the three licenses, and both companies currently operate casinos in Detroit.

## II.

An Indian tribe that offers gambling on its Michigan reservation, the Lac Vieux Desert Band of Lake Superior Chippewa Indians, sued because of the obvious handicap it and all other prospective off-reservation operators faced in the Detroit licensing process. Essentially, the Lac Vieux claims that the ordinance's preference provisions discriminate against it for having not taken Atwater and Greektown's particular political position in the casino legalization debate. According to the Lac Vieux, the ordinance's licensing procedure thus violates the guarantees of the First Amendment as well as of the Fourteenth Amendment's Equal Protection Clause.

In granting Detroit summary judgment on October 31, 1997, the district court held that the Lac Vieux lacked standing to bring its claims and that, even if the Lac Vieux did have standing, the claims lacked merit. The Lac Vieux appealed. We reversed the district court on all these issues, holding in particular that the district court's exceptionally deferential review of the ordinance, considering only whether Detroit conceivably could have had any rational reason to enact it as it had, was inappropriate. *See Lac Vieux Desert Band v. Michigan Gaming Control Board*, 172 F.3d 397, 409 (6th Cir. 1999) (*Lac Vieux I*). On remand, the district court purported to demand more of the ordinance but again sustained it. This second appeal followed. Our review of the district court's decision is *de novo*. *See United States v. Hill*, 167 F.3d 1055, 1063 (6th Cir. 1999).

## III.

The doctrine of the law of the case requires us to honor the prior rulings of this Court in this litigation. Although we acknowledge that there are limited exceptions to this general principle, we are satisfied that none of them apply now. *See United States v. Todd*, 920 F.2d 399, 403 (6th Cir. 1990);

With all due respect to the panel in *Lac Vieux I*, and to my co-jurists in the majority who feel bound by *Lac Vieux I*, I believe the standard of constitutional review employed in this case is incorrect. To adopt it puts us at odds with binding Supreme Court precedent and our sister Circuit Courts of Appeals. *See, e.g.*, *McClintock*, 169 F.3d at 815-17; *Shahar v. Bowers*, 114 F.3d 1097, 1102-03 (11th Cir. 1997) (en banc), *cert denied*, 522 U.S. 1049 (1998) ("the [*Umbehr*] Court held that government contractors are protected from termination or failure to renew their contracts for exercising their free speech rights and that the *Pickering* balancing test is the appropriate standard for determining whether a First Amendment violation has occurred"). Indeed, it puts us at odds with prior opinions of this very Court. *See, e.g., Thaddeus-X v. Blatter*, 175 F.3d 378, 392 (6th Cir. 1999) (noting that the *Pickering/Umbehr* test has been "applied in a variety of First Amendment settings," including even "the prison context").

Accordingly, I dissent, and suggest that this issue might be suitable for further review.

On remand, the district court struggled to reconcile the panel's reference to strict scrutiny with the Supreme Court's recognition in *Umbehr* and *O'Hare* of the circumscribed nature of the right at issue in these circumstances. The district court did so by finding that the right rested at the fringes of any strict scrutiny concern and that the level of review should be more deferential to the state than normally required when strict scrutiny applies. While as the majority concludes, that approach may be inappropriate, it is understandable given the obvious tension between the strict scrutiny reference in *Lac Viuex I* and the Supreme Court's contrary holdings in *Umbehr* and *O'Hare*.

While the majority is correct that strict scrutiny is not flexible enough to support the district court's conclusion on remand, I believe that, by accepting strict scrutiny as the standard to be applied in this case, the majority is committing error and forcing a manifest injustice on the parties. Even worse, I am not at all clear precisely what that injustice might be; the majority opinion does not explain what the district court should actually do, now, on remand. Should it "determine whether the offending provisions are severable from the remainder of the ordinance?" *Lac Vieux I,* 172 F.3d at 410. Revoke the appellees' licenses? Require the existing multi-million dollar casinos be razed? Hold a trial to measure damages? Hold a trial to determine if the appellant would have secured a license?[2]

---

[2]The *Lac Vieux I* panel concluded that the appellant had carried its *"burden on summary judgment"* of showing it was "ready and able to submit a proposal and that it was willing and able to pay the associated fees." 172 F.3d at 406 (emphasis added). In other words, there existed material questions of fact regarding whether the tribe was ready, willing, and able timely to do what was required to obtain a license. Appellees argue – correctly, it appears to me – that they could still prevail on all pending claims *at trial* if they prove that, in fact, the appellant was *not* ready, willing, and able to meet these requirements.

---

*Coal Resources, Inc. v. Gulf & Western Indus., Inc.*, 865 F.2d 761, 767 (6th Cir. 1989) (per curiam). The law of the case here is *Lac Vieux I*, and it establishes three propositions for our purposes: that the Lac Vieux has standing, that the preference provisions restrict First Amendment rights, and that, because the law permits that restriction only on the rarest of occasions, the ordinance is subject to the test commonly known as "strict scrutiny."[1] *See Lac Vieux I*, 172 F.3d at 407, 409-10. All *Lac Vieux I* leaves for us is the test's administration. We start by presuming that the ordinance is unconstitutional. Detroit can overcome that presumption only by proving that the ordinance is necessary to serve a compelling state interest and narrowly drawn to achieve that interest. *See id.* at 409 (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382-83 (1992)). In our view, the City is unable to meet this heavy burden. With the preference, the ordinance is fatally unfair, and the casino licenses Detroit has issued to date are illegitimate.

Applying the analytic framework that *Lac Vieux I* sets forth, we first ask whether Detroit can demonstrate that the ordinance serves a *compelling* governmental interest. It can. We accept that the preference promotes the stability of Detroit's political and tax systems, and these interests are indeed compelling under the First Amendment. *See Hernandez v. Commissioner*, 490 U.S. 680, 699 (1989); *Gable v. Patton*, 142 F.3d 940, 947 (6th Cir. 1998) (quoting *Storer v. Brown*, 415 U.S. 724, 736 (1974)); *see also Minneapolis Star v. Commissioner*, 460 U.S. 575, 586 (1983) (deeming government interest in raising revenue "critical" while deciding case on other grounds).

---

[1]Under *Lac Vieux I*, the ordinance also implicates the Equal Protection Clause by employing a classification that affects "a constitutionally protected fundamental right, the right to freedom of speech," *Lac Vieux I*, 172 F.3d at 410, but both the district court and the parties now treat this portion of the decision as merely an alternative basis for the application of strict scrutiny, *see id.* (citing *Clark v. Jeter*, 486 U.S. 456, 461 (1988)). We will do the same.

Given that the ordinance serves these "compelling" interests in some measure, we next ask if the ordinance is *necessary* in order for the interests to be served at all. Likewise, with regard to the First Amendment problem that *Lac Vieux I* has already decided exists, we look at whether the ordinance is the *least restrictive* possible way of serving those interests. Here, Detroit's arguments become unpersuasive. Were we to agree that the ordinance is theoretically *capable* of ensuring for Detroit a stable political system and a sound tax system, the proper inquiry remains whether those things cannot exist without the current ordinance on the books. Detroit stresses that the City's electorate had rejected proposals that would have legalized casino gaming on five prior occasions, and projects that it would also have rejected this one without some indication of the likelihood that the casinos would be run by, as the district court described Atwater and Greektown, "Detroit businesses who had already invested in the City [and] who had demonstrated their commitment to the revitalization of the City." However, this explanation goes to whether the preference was necessary to getting the ordinance passed, not to whether the preference is necessary to serve Detroit's compelling interests. In any event, the protections of the First Amendment cannot just be wished away, regardless of how much the government might like to do so. Furthermore, Detroit collapses the doctrinally accurate argument of whether the ordinance is necessary to serve its compelling interests into an argument that casinos themselves are necessary to do so. But Detroit has not demonstrated that its political and economic conditions are yet quite so dire that casinos present their last chance for salvation.

Accordingly, the preference renders the ordinance invalid. Absent the provision, we are confident that Detroit's interests could be served without intruding upon the Lac Vieux's First Amendment rights. The district court apparently decided otherwise because Detroit previously had rejected a means more restrictive than the preference, giving Atwater and Greektown an outright guarantee that casino licenses would be theirs. This was erroneous. As the Lac Vieux has put it,

*pre-existing commercial relationship* with the government, [the Court did] not address the possibility of suits by bidders or applicants for new government contracts who cannot rely on such a relationship." *Id.* at 685 (emphasis added). When, as here, there is *not* a pre-existing commercial relationship between the state and the bidder or applicant for a government contract, the balance falls even more in favor of the state. *See McClintock v. Eichelberger*, 169 F.3d 812, 815-17 (3rd Cir. 1999), *cert. denied*, 528 U.S. 876 (1999) (noting, in circumstances similar to those presented in this case, that the balancing test called for by *Umbehr* and *O'Hare* was too strict, because the plaintiff did not have a pre-existing, ongoing contractual relationship with the state). In fact, at least one district court has applied *McClintock* and concluded that, when there is "no such ongoing commercial relationship, there is no First Amendment protection and thus in the absence of such a relationship, a cause of action is not recognized for failure to award a contract in retaliation for exercise of one's First Amendment rights." *Halstead v. Motorcycle Safety Foundation Inc.*, 71 F. Supp.2d 464, 473-74 (E.D. Pa. 1999).

Laudably, the panel in *Lac Vieux I* tried to give the district court some guidance on how to measure the constitutionality of the Detroit ordinance. As the panel admitted, however, "the district court and the parties have provided [us with] little guidance on the question" of the correct standard of constitutional review. *Lac Vieux I*, 172 F.3d at 409. Indeed, in the absence of this guidance, the *Lac Vieux I* panel looked to cases involving criminal ordinances restricting speech, rather than to *Umbehr* or *O'Hare*, when it suggested the appropriate level of review. *Id.* at 409-10 (citing *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382-383 (1992), in which a criminal defendant challenged an ordinance prohibiting bias-motivated disorderly conduct, and *Frisby v. Schultz*, 487 U.S. 474, 481 (1988), in which abortion protestors challenged an ordinance prohibiting picketing near an individual dwelling).

*Vieux I* that the ordinance must survive strict scrutiny is clearly erroneous, and that application of this test would work a manifest injustice.

In *Board of County Comm'rs, Wabaunsee Cty., Kansas v. Umbehr*, 518 U.S. 668 (1996), the Supreme Court considered the question of "whether, and to what extent, the First Amendment restricts the freedom of federal, state or local governments to terminate their relationships with independent contractors because of the contractors' speech." *Id.* at 673-74. Resolving "a conflict between the Courts of Appeals," the Supreme Court held that: (1) the First Amendment does protect independent contractors from termination of government contracts in retaliation for exercising free speech rights; and (2) "the *Pickering* balancing test, adjusted to weigh the government's interests as contractor rather than as employer, determines the extent of their protection." *Id.* at 673 (citing *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty., Illinois*, 391 U.S. 563, 568 (1968)); *see O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712, 719 (1996).

The *Pickering* balancing test, in turn, calls for weighing the plaintiff's "right to speak on a matter of public concern against 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Hardy v. Jefferson Community College*, 260 F.3d 671, 679-80 (6th Cir. 2001) (quoting *Pickering*, 391 U.S. at 568). And, when measuring the balance, a district court should "deferentially view" the state's "legitimate interests as contractor." *Umbehr*, 518 U.S. at 685. The likelihood that the Detroit ordinance could pass constitutional muster under this test, of course, is far higher than under the strict scrutiny test.

Indeed, even this *Umbehr/Pickering* balancing test may be too stringent. The Supreme Court in *Umbehr* was careful to note the "limited nature" of its decision, stating that, because the plaintiff's lawsuit "concern[ed] the termination of a

the district court effectively turned this aspect of strict scrutiny "on its head," failing to recognize that Detroit's ordinance must do the least damage to the First Amendment, not just avoid doing the most damage. A less restrictive means of serving the interests Detroit has identified is simply leaving the preference out.

By employing the preference, Detroit basically sought to end the high-stakes competition for two of the three Detroit casino licenses before it really began. This we cannot allow. Barring governments from endorsing or punishing political activity, or the lack of it, is among the paramount functions of the First Amendment's Free Speech Clause. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) ("[E]xpression on public issues 'has always rested on the highest rung of the hierarchy of First Amendment values.'" (quoting in part *Carey v. Brown*, 447 U.S. 455, 467 (1980))); *see also Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 573 (1995) ("One important manifestation of the principle of free speech is that one who chooses to speak may also decide 'what not to say.'" (quoting in part *Pacific Gas & Electric Co. v. Public Utilities Comm'n of Cal.*, 475 U.S. 1, 16 (1986) (plurality opinion))). In this tradition, the decision of the district court is REVERSED and REMANDED for proceedings consistent with this opinion.

————————

## DISSENT

————————

KATHLEEN McDONALD O'MALLEY, District Judge, dissenting. The majority reverses the district court based on two conclusions: (1) the Detroit ordinance is constitutional only if it survives "strict scrutiny;" and (2) the ordinance does not pass this rigorous test. I agree with the second conclusion – as the Supreme Court has noted, "it is the rare case in which . . . a law survives strict scrutiny." *Burson v. Freeman*, 504 U.S. 191, 211 (1992). I do not agree, however, that the ordinance is constitutional only if it survives strict scrutiny analysis. Accordingly, I respectfully dissent.

The majority notes that, in *Lac Vieux I*,[1] a different panel concluded that the preference provisions contained in the ordinance "implicate[] the First Amendment." 172 F.3d at 409. I agree with the majority, op. at 4, that this is the law of the case. I do not agree with the majority, however, that it is also the law of the case that the test for constitutionality which the ordinance must survive is strict scrutiny. While the panel in *Lac Vieux I* wrote: "[a]lthough the district court and the parties have provided little guidance on the question, *principally because the district court did not reach this issue*, we conclude that the ordinance is content-based and is therefore subject to strict scrutiny," *id.* at 409-10 (emphasis added), that conclusion was gratis dictum. *See Black's Law Dictionary* (7th ed. 1999) (defining gratis dictum as "a court's discussion of points or questions not raised by the record"). In fact, the ruling in *Lac Vieux I* was simply and only that the Lac Vieux tribe had standing to challenge the Detroit ordinance and that such a challenge did "implicate the First Amendment." The statement that, on remand, the district

---

[1] *Lac Vieux Desert Band v. Michigan Gaming Control Board*, 172 F.3d 397, 409 (6th Cir. 1999).

court should apply a strict scrutiny analysis to the Detroit ordinance was not necessary to the panel's ruling.

Of course, the district court would have been unwise to ignore the suggestions made in *Lac Vieux I* on how to proceed. I disagree, however, that this Court is constrained by the law of the case doctrine to follow that same suggestion. As the *Lac Vieux I* panel expressly stated, at that juncture, neither the parties nor the district court had addressed the critical issue of the appropriate level of constitutional review. As noted, the district court below and the parties on appeal in *Lac Vieux I* focused on whether the plaintiff had standing to assert its claims *at all* and whether, if so, those claims were even cognizable under the First Amendment – legal questions that were hotly disputed. To the extent the *Lac Vieux I* panel expressed an opinion on anything beyond those threshold questions, accordingly, it did so without the benefit of briefing, argument, or a lower court decision on the issue. In contrast, the briefing before this panel contains substantial argument regarding the proper constitutional standard to be applied in the circumstances presented here. I do not believe we should relegate the analysis of this critical question to a one-sentence reference in a prior opinion, out of an unnecessary desire to adhere to the law of case doctrine. Indeed, I do not believe the *Lac Vieux I* panel would feel bound by its own dicta, or expect this panel to be bound by it.

Furthermore, even if *Lac Vieux I* did establish the law of this case to be that the Detroit ordinance must be narrowly drawn to serve a compelling state interest, I still believe we should not be bound by this pronouncement. "A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 817 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618, n. 8 (1983)). I am afraid that, in fact, the pronouncement in *Lac*