United States Court of Appeals
Fifth Circuit

**F I L E D**

**November 23, 2004**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 03-51369

_____

ALAN W. ALEXANDER; BILLY DAVIS; JOSEPH RANDY DILLARD; RUBEN
DURAN; KENNY FOSTER; MARIA G. GARZA; GREGORY HAIRE; BOBBY HARPER;
EDUARDO JIMENEZ; DENNIS D. LAND; DANNY LEWIS; WILLIAM D. LORD;
JAMES S. LUCAS; GARY P. MCCULLY; ROBERT E. RALLS; JERRY SCHWAB,

                    Plaintiffs - Appellees-Cross-Appellants,

versus

WALTER "CHAPS" EEDS, III, Individually; GRADY MICHAEL DUNN,
Individually; MICHAEL DOUGLAS SCOTT, Individually; KENT WEIR
MAWYER, Individually; DAVID MAURY GRIFFITH, Individually; EARL
WELDON MCNEIL, JR., Individually,

                    Defendants - Appellants-Cross-Appellees.

--------------------
Appeals from the United States District Court
for the Western District of Texas
--------------------

Before REAVLEY, WIENER, and BENAVIDES, Circuit Judges.

FORTUNATO BENAVIDES, Circuit Judge:

In this direct civil appeal, Alan W. Alexander and other
Texas Department of Public Safety ("DPS") Officers, Plaintiffs -
Appellees-Cross-Appellants, challenge the district court's
rulings granting summary judgment and judgment on the pleadings
in favor of Walter "Chaps" Eeds, III, and other senior DPS
officials, Defendants - Appellants-Cross-Appellees.  Defendants
challenge the district court's denial of summary judgment on two

1

Plaintiffs' claims.  For the reasons that follow, we affirm, in part, and reverse, in part.

**I. Background**

Alan W. Alexander, Billy Davis, Joseph Randy Dillard, Ruben Duran, Kenny Foster, Maria G. Garza, Gregory Haire, Bobby Harper, Eduardo Jimenez, Dennis D. Land, Danny Lewis, William D. Lord, James S. Lucas, Gary P. McCully, Robert E. Ralls, and Jerry Schwab, Plaintiffs in this case, are all DPS lieutenants. Defendants, Walter "Chaps" Eeds, III, Grady M. Dunn, Michael D. Scott, Kent W. Mawyer, David M. Griffith, and Earl W. McNeil, Jr., are all DPS supervisors.  Plaintiffs participated in a competitive examination process to advance from the rank of "lieutenant" to that of "narcotics service captain."

A six-member panel administered part of the examination. Five of its members are Defendants in this case: Eeds, Dunn, McNeil, Mawyer, and Griffith.  The sixth board member was Assistant Commander Wilber Eugene Hawkins.  The eleven candidates with the highest scores were sent to Defendant Chief Scott. After reviewing the list of eleven, Scott sent it to Thomas A. Davis, Director of DPS, who was empowered to make alternative promotions for just cause.  Following Davis's ratification, the lieutenants with the eleven highest scores received promotions.

Plaintiffs allege that senior officers, including Defendants Scott, Eeds, and Dunn, unfairly preselected eleven candidates for

2

promotion. They claim that Defendants belonged to an informal social organization called the "Houston Bar-B-Que Club," which influences DPS promotions and policy. The senior officers in the Club groom their favorites for leadership positions in DPS. Scott, Eeds, Dunn, and Deputy Commander Bobby Duvall devised a strategy for rigging the examination results and shared this with the other members of the examination panel.

Seven Plaintiffs claim that they were blackballed because of constitutionally-protected statements they made. These seven are Foster, Harper, Alexander, Lucas, Schwab, Ralls, and McCully.[1]

Plaintiffs filed suit in the Austin Division of the U.S. District Court for the Western District of Texas on August 20, 2002. The suit alleged, *inter alia*, violations of the U.S. Constitution's Equal Protection Clause. After Defendants filed a motion to dismiss, Plaintiffs amended their complaint to include a new 42 U.S.C. § 1983 claim alleging retaliation for protected speech. On November 27, 2002, the district court dismissed all claims except for the § 1983 retaliation claim.

Following discovery, Defendants moved for summary judgment on all claims. On November 7, 2003, the district court granted summary judgment, *inter alia*, on the protected speech retaliation

[1]McCully is not addressed in the district court's order, but his First Amendment retaliation claim was dismissed. Plaintiffs assume the grounds for the dismissal of McCully's claim were the same as for the others because of the similar set of facts at issue, and thus we treat them as such.

claims of Alexander, Lucas, Ralls, and Schwab, and denied summary judgment on the claims of Foster and Harper. Following this judgment, both sides filed appeals. Through agreement and court order all other claims have been removed to state court or dismissed.

## II. Discussion

We review grants of summary judgment under Federal Rule of Civil Procedure 56 de novo, applying the same standards the district court used. *Am. Home Assurance Co. v. United Space Alliance, LLC*, 378 F.3d 482, 486 (5th Cir. 2004). "A summary judgment motion is properly granted only when, viewing the evidence in the light most favorable to the nonmoving party, the record indicates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." *Id.* Facts are material only if they could affect the lawsuit's outcome. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Any factual controversy will be resolved in the nonmovant's favor, but only "when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999).

### A. Protected speech retaliation claims of Lucas, Alexander, Ralls, Schwab and McCully

Plaintiffs argue that the district court erred in granting the motion for summary judgment with regard to the retaliation

4

claims of Lucas, Alexander, Ralls, Schwab and McCully.[2]

To establish a § 1983 claim for retaliation, Plaintiffs must show: (1) they suffered an adverse employment action; (2) the speech at issue involved matters of public concern; (3) Plaintiffs' interest in the speech outweighs the government's interest in efficiency; and (4) the speech precipitated the adverse employment action. *Kinney v. Weaver*, 367 F.3d 337, 356 (5th Cir. 2004). If this test is passed, the burden shifts to Defendants to show that "they would have come to the same conclusion in the absence of the protected conduct." *Beattie v. Madison County Sch. Dist.*, 254 F.3d 595, 601 (5th Cir. 2001).

The district court found that Lucas, Alexander, Ralls, Schwab, and McCully failed to establish a § 1983 claim because they did not proffer evidence showing speech on matters of public concern, the second requirement. We agree with this conclusion.

"Matters of public concern are those which can 'be fairly considered as relating to any matter of political, social, or other concern to the community.'" *Branton v. City of Dallas*, 272 F.3d 730, 739 (5th Cir. 2001) (quoting *Connick v. Meyers*, 461 U.S. 138, 146 (1983)). "While speech pertaining to internal personnel disputes and working conditions ordinarily will not involve public concern, speech 'complaining of misconduct within

---

[2]As noted *supra*, the district court's ruling did not address McCully.

the police department . . . [is] speech addressing a matter of public concern.'" *Id.* (citations omitted).

In *Connick*, the Supreme Court taught that "when a public employee speaks . . . as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." 461 U.S. at 147. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement." *Id.* at 147-48. This Court followed that dictate in *Branton* when it ruled that disclosure of a police officer's malfeasance constitutes a public concern. *See* 272 F.3d at 739-40.

Each Plaintiff attempts to identify incidents of protected speech. Alexander objected to a policy imposed by DPS management that prohibited narcotics officers from wearing identity-concealing masks, or balaclavas, when conducting raids. This policy was generated in response to a DPS Commissioner's concern that wearing such masks would give DPS a bad image. Alexander and others expressed fear about potential drug dealer retaliation against officers identified in the raids. Lucas posed questions to higher-ups concerning the fairness of the promotion process. Ralls questioned the promotion process' fairness and the

6

balaclavas policy, and complained over a period of time about what he perceived as numerous policy and law violations in the department. Schwab voiced concern about the promotion test's fairness. Finally, McCully objected to the balaclavas policy and helped an officer receive public commendation against the wishes of a DPS supervisor.

Plaintiffs' complaints about the promotion process were essentially private, not public in nature. These concerns were voiced only in the form of questions regarding each officer's attempt to attain promotion, not about general promotion policy. The form of these questions was clearly private, as they were not leaked to a reporter or sent to an elected state official. *Cf. Markos v. City of Atlanta*, 364 F.3d 567, 571 (5th Cir. 2004) (finding plaintiff's speech "quintessentially public as his comments appeared in the form of an article in the local newspaper"). The context of these comments was also completely private. No one could reasonably argue that these complaints "'were made against a backdrop of widespread debate in the community'" or could "make valuable contributions to public debate." *See id.* at 572 (citations omitted). They were merely private concerns reflecting personal interest.

Likewise, conversation about the balaclavas policy is most properly understood in this situation as private. No ongoing public debate raged on this issue, and no one outside DPS was

7

contacted regarding this matter.  *Cf. Tompkins v. Vickers*, 26 F.3d 603, 607 (5th Cir. 1994) (finding speech to be public when art teacher's complaints in a "letter to the editor of the local newspaper" about elimination of art program "were made against a backdrop of widespread debate in the . . . community regarding the art program").

McCully's efforts to see that a junior officer be commended for an act of heroism is not an issue of public policy.  There was no policy being debated or malfeasance disclosed.

Finally, we cannot conclude that any of Ralls's additional speech addressed a public concern.  There is not enough context given in the briefs or in the record to make such a finding.

While the facts of this case give us great pause in as much as they reflect a very troubling promotion process, reeking of cronyism, within DPS, because the § 1983 actions are brought to us in the context of alleged First Amendment violations, the inquiry necessary leads us to conclude that Plaintiffs' claims are unsupported.  Because the speech of Lucas, Alexander, Schwab, Ralls, and McCully was not protected by the First Amendment, the district court correctly granted summary judgment on these § 1983 claims.  We affirm the district court's ruling.

## B. Qualified immunity

The district court also granted summary judgment for Defendants as to the § 1983 claims of Lucas, Ralls, Alexander,

8

and Schwab, on the alternative ground of qualified immunity.[3]  It denied summary judgment on the basis of qualified immunity with regards to the § 1983 claims of Foster and Harper.[4]

To determine whether government officials are entitled to qualified immunity, we apply a two-step test.  "First, a court must decide whether a plaintiff's allegation, if true, establishes a violation of a clearly established right." *Hernandez v. Tex. Dept. of Protective & Regulatory Servs.*, 380 F.3d 872, 879 (5th Cir. 2004).  Without an established right, qualified immunity is granted.  *Id.*  "Second, if the plaintiff has alleged a violation, the court must decide whether the conduct was objectively reasonable in light of clearly established law at the time of the incident."  *Id.*

We dispense with any further analysis concerning Lucas, Ralls, Alexander, Schwab, and McCully.  As concluded *supra*, their speech was not constitutionally protected.  Therefore, they have not successfully alleged a violation of an established right and qualified immunity was properly granted.

Determining whether Foster and Harper have alleged a violation of a clearly established right involves an application of constitutional standards as they existed at the time of the

---

[3]Again, for our purposes, it is assumed that this ruling applied to McCully as well.

[4]This denial is properly appealable to this Court.  *See Behrens v. Pelletier*, 516 U.S. 299, 307 (1996).

9

alleged violation.[5]  *See Hare v. City of Corinth*, 135 F.3d 320,

326 (5th Cir. 1998).  In this case, the standard is that of

retaliation for speech protected by the First Amendment under §

1983.  *See Lukan v. North Forest Indep. Sch. Dist.*, 183 F.3d 342,

345-46 (5th Cir. 1999).  Thus, to decide whether Harper and

Foster have alleged facts that could show a violation of a

clearly established right, we use the same four-part test applied

*supra*: (1) Did Harper and Foster suffer adverse employment

actions?; (2) Did the speech at issue involve matters of public

concern?; (3) Do Harper's and Foster's interests in their speech

outweigh the government's interest in efficiency?; and (4) Did

the speech precipitate the adverse employment action?  *See*

*Kinney*, 367 F.3d at 356.

If this test is passed, the burden shifts to Defendants to

show that "they would have come to the same conclusion in the

absence of the protected conduct."  *Beattie*, 254 F.3d at 601.  To

begin, we must determine whether Harper and Foster allege facts

showing violations of a constitutional right.[6]  It is clear that

Plaintiffs have suffered an adverse employment action in that

[5]Defendants contend that we must consider each Defendant
separately during the qualified immunity analysis.  Because of
evidence that would allow a finder of fact to determine all
Defendants acted in concert in rigging the promotion process, we
treat all Defendants similarly for present purposes.

[6]"Where factual disputes exist in an interlocutory appeal
asserting qualified immunity, we accept the plaintiffs' version
of the facts as true."  *Kinney*, 367 F.3d at 348.

10

they were not promoted, so no analysis is needed on that first part of the test.

In 2001, Foster, who performed internal affairs investigations for DPS, discovered that DPS Lieutenant Dan Walker was unable to account for twenty-eight firearms under his care. Foster subsequently learned that Walker's alleged carelessness violated state code and departmental policy. Walker resigned his position to avoid punishment. Shortly before resigning, the heretofore friendly Walker completely avoided Foster, indicating he knew Foster reported the negligence. Walker's brother, also a DPS employee, was friends with Eeds and Dunn.

Harper's case involves a state law passed in 2000 requiring a certain number of "non-mission critical personnel" to turn their police vehicles in to the department so transportation would be available at a central location. DPS Director Davis decided that this new rule would not apply to upper-level management since personal use of police vehicles was traditionally a perk for those who received promotions. Instead, lower-level officers, some of whom actually needed to have constant access to their vehicles, were directed to park them at headquarters. Davis then informed the legislature that DPS complied with the new law. Some of the vehicles now mandatorily parked at headquarters were SWAT vehicles. Concerned about the situation, Harper, a SWAT team member, complained to his superiors and other state officials. An aide to Representative

Pete Gallego advised Harper that the law was not meant to apply to SWAT vehicles and Harper relayed this to one of his superiors. He warned Harper to cease his efforts or risk losing his job.

In May 2000, Davis was questioned by the Chairman of the Criminal Justice House Committee about this situation. The Representative had received a letter of complaint from Harper. Davis informed him that the problem had been corrected and Harper had resigned. Harper believed that both of these statements constituted perjury and he reported this to his supervisor.

*1. Did Harper's and Foster's speech involve a public concern?*

As discussed in greater detail *supra*, "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement." *Connick*, 461 U.S. at 147-48. We apply this same test to the speech of Harper and Foster.

Foster's speech did not deal with a matter of public concern. We have stated: "'The disclosure of misbehavior by public officials is a matter of public interest and therefore deserves constitutional protection, especially when it concerns the operation of a police department.'" *Branton*, 272 F.3d at 745 (citation omitted). And, in *Branton*, we found that an internal affairs officer's complaint did constitute a public concern. *See id.* at 740-41. Specifically, Branton complained to the Assistant City Manager of dishonest testimony given by an officer at a

disciplinary hearing.  *See id.* at 736-37.

The facts of *Branton* are distinguishable, though.  First, as to content, Branton's speech concerned lying to a public official – clear "malfeasance."  As we have noted, "speech reporting official misconduct, wrongdoing, or malfeasance on the part of public officials involves matters of public concern."  *Denton v. Morgan*, 136 F.3d 1038, 1043 (5th Cir. 1998).  Foster's speech disclosed incompetence, not wrong-doing or corruption.   The form of Branton's speech, a complaint to a city official, went outside of the police department, whereas Foster's filing of a report concerning missing weapons was an internal DPS matter.  Finally, the context of Foster's speech was private, in that it had nothing to do with a public debate or existing public issue.  *See Markos*, 364 F.3d at 572.  Foster was not a whistleblower, but an internal investigator compiling reports on police error as part of his job.  *See Foley v. Univ. of Houston Sys.*, 355 F.3d 333, 341-42 (5th Cir. 2003) ("[I]f the individual spoke primarily as an employee rather than as a citizen, [his speech] is not regarded as addressing a matter of public concern.").

Because we have not found speech on a public concern, we find no established right was violated.  We, therefore, reverse the district court's ruling and grant qualified immunity to Defendants on Foster's § 1983 claim.

Harper's speech, on the other hand, concerns a public issue.

13

He alleged misapplication of state law and perjury before the Texas legislature. His method, contacting elected state officials, is clearly public, as is the context in that it concerned a state law and public testimony before an elected body.

Thus, to determine if Plaintiffs are entitled to qualified immunity as to Harper's speech we must consider the rest of the four-part test.

### 2. Does Harper's interest in his protected speech outweigh DPS' interest in efficiency?

Harper's speech also passes this prong of the analysis. We apply the "*Pickering* balancing test," which balances a plaintiff's First Amendment rights, on one hand, and "'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees,'" on the other. *Rankin v. McPherson*, 483 U.S. 378, 388 (1987) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). It "recognize[s] as pertinent considerations whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships . . . , or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id.* There is no evidence that Harper's speech damaged DPS morale or efficiency. He was not disobedient; rather he wanted to ensure the law was followed.

14

*3. Did the speech precipitate the adverse employment action?*

Harper presents evidence that could allow a fact finder to infer a causal connection between his protected speech and the denial of a promotion. For instance, he received a warning that he could be fired because of his speech.

*4. Would Defendants have come to the same conclusion absent the protected speech?*

The evidence proffered by Plaintiffs in this case could allow a reasonable finder of fact to conclude that the promotion process was rigged against Plaintiffs. And, since Harper's speech clearly threatened senior DPS officials, one could reasonably deduce that Defendants would not have reached the same conclusion absent the protected conduct.

*5. Was Defendants' alleged behavior objectively reasonable?*

Since Harper has successfully alleged a violation of a clearly established right, the final question is whether this right existed at the time of the violation so that Defendants' alleged behavior may be deemed objectively unreasonable. Harper "must show that 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.' . . . Qualified immunity should not be denied unless the law is such that reasonable officials should be 'on notice [that] their conduct is unlawful.'" *Kinney*, 367 F.3d at 367 (citations omitted).

Reporting serious police misconduct or corruption is an

15

activity with well-established protections.  *See Branton*, 272 F.3d at 744 ("For at least thirty-four years, it has been settled that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression."); *Brawner v. City of Richardson*, 855 F.2d 187, 191-92 (5th Cir. 1988) ("The disclosure of misbehavior by public officials is a matter of public interest and therefore deserves constitutional protection, especially when it concerns the operation of a police department.").  Thus, Defendants are not entitled to qualified immunity for the alleged § 1983 violation concerning Harper.  We affirm the district court's ruling.

### C. Plaintiffs' Equal Protection Claims

While we do not approve of promoting friends over others who may have superior objective qualifications, we cannot say that such a practice is not rationally related to a legitimate governmental objective.  *See Kotch v. Bd. of River Port Pilot Comm'rs.*, 330 U.S. 552, 563 (1947) (upholding nepotistic system of appointing State-employed pilots as rationally related to the legitimate governmental interest of "morale and *esprit de corps*").  Thus, the district court correctly granted Defendants' Federal Rule of Civil Procedure 12(b)(6) motion on the ground that Plaintiffs failed to present a Fourteenth Amendment equal protection violation.  Accordingly, we affirm the district

16

court's ruling.

The denial of summary judgment for Defendants on Foster's § 1983 claim is REVERSED.  The rulings of the district court are otherwise AFFIRMED.  This matter is REMANDED for further appropriate proceedings.