United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 31, 2006**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 05-10836

OSCAR RENDA CONTRACTING, INC.; ET AL

Plaintiffs

OSCAR RENDA CONTRACTING, INC.; JOHN C. BECK

Plaintiffs - Appellants

VERSUS

THE CITY OF LUBBOCK TEXAS; MARC MCDOUGAL, in his official
capacity as Mayor for injunctive relief

Defendants - Appellees

Appeal from the United States District Court
For the Northern District of Texas, Lubbock
5:05-CV-29

Before DAVIS, BARKSDALE, and DeMOSS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Appellant, Oscar Renda Contracting, Inc. ("Renda") appeals the

district court's order dismissing its suit for failure to state a

claim.  The principal issue in this case is whether the First

Amendment protects a contractor whose bid has been rejected by a

city in retaliation for the contractor's exercise of freedom of

speech where the contractor had no pre-existing relationship with

that city.  Although the Supreme Court expressly reserved this question in *Board of County Commissioners v. Umbehr*, 518 U.S. 668, 116 S. Ct. 2342 (1996), the Court's analysis in that case when read along with *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 110 S.Ct. 2729 (1990), persuades us that the absence of a prior relationship would not preclude the contractor's claim.  We vacate the order dismissing this case and remand it to the district court for further proceedings.

## I.

Appellant, Renda, is a construction company based in Roanoke, Texas, and specializes in public works projects.  The Appellee, City of Lubbock ("the City"), is an incorporated municipality in Texas.   The City requested bids for construction of improvements to its storm drainage system—the "South Lubbock Drainage Improvements Project."  Renda submitted the lowest bid by more than $2.2 million.  The next lowest bidder was Utility Contractors of America ("UCA").  Under Texas law, the City is required to award the contract to the "lowest responsible bidder."[1]

After becoming aware that City officials had recommended that the City award the contract to UCA, Renda requested a meeting with the City staff officials.  During the meeting, the City officials apparently stated that they knew Renda had previously filed a lawsuit against the El Paso Water District ("Water District suit")

---

[1]Tex. Loc. Gov't Ann. § 252.043(d)(1)(Vernon Supp. 2005).

2

and was awarded damages, and they expressed concern that Renda was "lawsuit happy." Renda explained to the City staff officials its reasons for filing the lawsuit, and Renda left the meeting believing it had dispelled any concerns the City officials had regarding the lawsuit. The City officials recommended the acceptance of Renda's bid proposal, but only on the condition that Renda execute an affidavit reaffirming its familiarity with the conditions and requirements of the construction project and the applicable contractual provisions. Renda complied with the demand and signed the affidavit on the same day the City Council voted on the contract.

Despite the signed affidavit, the Council awarded the contract to UCA, by a 4-3 vote, claiming that they had reservations concerning Renda's business practices. Renda, on the other hand, alleged that the City's real reason for denying its bid stemmed from Renda's lawsuit against the Water District. Renda alleged in Paragraph 17 of its petition that it was explained to City representatives, including the attorneys from the City Attorneys' Office, that Renda asserted a First Amendment retaliation claim and a breach of contract claim in the Water District case. Renda also alleged that it prevailed in this suit.

Renda filed suit in the district court seeking damages and other relief because the City retaliated against it for exercising

its First Amendment rights.[2]  The district court granted the City's motion to dismiss the First Amendment retaliation claim because (1) Renda did not allege that the speech involved a matter of public concern *to the relevant city of Lubbock, Texas;* and (2) Renda did not have a pre-existing commercial relationship with the City.  On appeal, Renda argues that the district court erred in resolving both issues against it and in dismissing its suit.

## II.

## A.

We review dismissals under Rule 12(b)(6) *de novo.  Causey v. Sewell Cadillac-Chevrolet, Inc.,* 394 F.3d 285, 288 (5th Cir. 2004)(citing *Hamilton v. United Healthcare of Louisiana, Inc.*, 310 F.3d 385, 388 (5th Cir.2002)).  "In doing so, we accept as true the well-pleaded factual allegations in the complaint."  *Id.* (citing *Hermann Holdings Limited. v. Lucent Technologies Inc.,* 302 F.3d 552, 557 (5th Cir.2002)).  The dismissal should be upheld only if it appears beyond doubt that the plaintiffs can prove no set of facts in support of their claim which entitles them to relief.  *Id.* (quotations and citations omitted).  Subsumed within this standard, is the requirement that the plaintiff's complaint be stated with enough clarity to enable a court or an opposing party to determine whether a claim is sufficiently alleged. *Elliot v. Foufas,* 867 F.2d

---

[2]Renda asserted other claims which are not before us on appeal.

877, 880 (5th Cir. 1989).

**B.**

Renda argues first that the district court erred in concluding that it failed to adequately allege that Renda's speech — the Water District lawsuit — involved a matter of public concern. To state a First Amendment retaliation claim, an employee suing his employer must establish four elements: (1) the employee must suffer an adverse employment decision; (2) the employee's speech must involve a *matter of public concern*; (3) the employee's interest in commenting on matters of public concern must outweigh the defendant's interest in promoting efficiency; and (4) the employee's speech must have motivated the employer's adverse action. *Kinney v. Weaver,* 367 F.3d 337, 356 (5th Cir. 2004)(en banc)(emphasis added). The Supreme Court explained in *Connick v. Myers*, 461 U.S. 138, 147-48 (1983), that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record."

As stated earlier, the district court concluded that the plaintiffs failed to plead that the prior lawsuit against El Paso Water District involved a matter of public concern because the suit had nothing to do with a public issue in Lubbock and thus did not address a matter of public concern *to Lubbock* — "*the relevant community*".

5

The City relies on the language in a number of Supreme Court cases and cases from this court requiring proof that the speech is a matter of concern in the "community." *See, e.g., Connick*, 461 U.S. at 146 (1983)(stating that the speech should fairly relate to a "matter of political, social, or other concern to the community"); *Alexander v. Eeds,* 392 F.3d 138, 143 (5th Cir.2004)(quoting *Markos v. City of Atlanta*, 364 F.3d 567, 572 (5th Cir. 2004))(concluding that the speech at issue was not public speech because "no one could reasonably argue that [the] [] complaints were made against a backdrop of widespread debate *in the community*" but were merely matters of private concern)(emphasis added); *Tompkins v. Vickers,* 26 F.3d 603, 607 (5th Cir. 1994)(stating that the plaintiff's speech was made "against a backdrop of widespread debate *in the Greenville community* regarding the art program and other aspects")(emphasis added).

The City tracks the position taken by the district court and argues that while allegations in the Water District suit of wrongdoing by El Paso officials might be a matter of public concern in El Paso, it would be of little interest to the residents of the Lubbock community.

We have found no cases expressly discussing whether the speech at issue must be a matter of public concern in the community where the retaliation and plaintiff's damages occur. However, the district court's affirmative answer to this question is

6

inconsistent with the result in this circuit's *en banc* decision in *Kinney*. 367 F.3d 337.

In that case we permitted plaintiffs to assert claims for First Amendment retaliation even though the location of the protected activity and the place where the retaliatory activity occurred were hundreds of miles apart. *Kinney,* 367 F.3d 337. At argument, the City agreed that *Kinney* was dispositive of this issue.

This conclusion is also more consistent with our reading of the Supreme Court's cases that public concern has a broader meaning than that given by the City. As the Supreme Court in *City of San Diego v. Roe*, 543 U.S. 77, 83-4, 125 S.Ct. 521, 525-26 (2004), stated "[t]hese cases make clear that public concern is something that is a subject of legitimate news interest." We conclude, therefore, that the district court erred in concluding that Renda's complaint failed to allege that the Water District lawsuit was a matter of "public concern in the community" because the protected activity (the lawsuit) occurred in El Paso rather than Lubbock, where the retaliation occurred.

## C.

The City also argues that Renda's allegation that its bid was rejected because it filed a lawsuit against the El Paso Water District is insufficient to raise an inference that the lawsuit is a matter of public concern. If the petition alleged only that

Renda filed a lawsuit we would agree with the City. In this circuit an employee's suit against her employer is not considered per se a matter of public concern. If the lawsuit is only a matter of personal interest to the employee, it is not considered a matter of public concern. *See Rathjen v. Litchfield*, 878 F.2d 836, 842 (5th Cir. 1989)(citing Day v. *South Park Indep. Sch. Dist.*, 768 F.2d 696, 700 (5th Cir. 1985 )).

But Renda alleged in Paragraph 17 that its suit "involved Renda asserting a First Amendment retaliation claim and a breach of contract claim." Renda also alleged that its suit sought to "redress violations of federally protected rights." Together, these allegations are sufficient under a 12(b)(6) standard to put the City on notice that its El Paso suit involved more than Renda's personal interests and implicated matters of public concerns.

We, therefore, conclude that Renda's petition was sufficient to put the City on notice that its El Paso suit involved matters of public concern.

**D.**

We turn next to Renda's argument that the district court erred in concluding that unless a contractor has a prior relationship with a governmental entity, the contractor cannot state a First Amendment claim against that entity for rejecting the contractor's bid in retaliation for the contractor's exercise of its right to free speech.

8

The Supreme Court has held in a governmental employment context that no prior relationship is required before an employee is permitted to assert a claim for First Amendment retaliation. More particularly, the Court in *Rutan* held that a government entity's refusal to hire an employee for engaging in protected activity supports a claim for First Amendment retaliation. 497 U.S. at 74 (relying in large part upon *Perry v. Sindermann*, 408 U.S. 593, 597 (1972), and applying it to the patronage context); *see also Pierce v. Tex. Dep't of Criminal Justice*, 37 F.3d 1146, 1149 (5th Cir. 1994). The Supreme Court has explained that the protection from political patronage is to "prevent[] the government, except in the most compelling circumstances, from wielding its power to interfere with its employees' freedom to believe and associate, or to not believe and not associate." *Rutan*, 497 U.S. at 76. Similarly, this court has held that the focus of permitting claims for First Amendment retaliation should be based upon "the government's duty not to punish protected speech, not the citizen's supposed 'right' to government patronage." *Kinney*, 367 F.3d at 357.

In *Blackburn v. City of Marshall*, 42 F.3d 925 (5th Cir. 1995), this court extended the same First Amendment protection enjoyed by employees to contractors dealing with a governmental entity. Blackburn, who was the owner of a wrecker service, brought suit against the City of Marshall under 42 U.S.C. § 1983, alleging in

9

part that the City retaliated against him for his protected First Amendment activities by revoking his permission to use the city radio frequency. This action effectively rendered Blackburn ineligible to participate in the rotation list for wrecker service. *Id.* at 929-30. The district court dismissed Blackburn's suit for failure to state a claim, reasoning that Blackburn was not entitled to assert First Amendment retaliation claims because he was a contractor and not a public employee. *Id.* at 930. We reversed the dismissal, holding that independent contractors enjoy First Amendment protections against governmental interference with free speech. *Id.* at 929.

One year later, in *Board of County Commissioners v. Umbehr*, 518 U.S. 668 (1996), the Supreme Court of the United States agreed with this court's holding in *Blackburn*. In *Umbehr*, a trash hauler lost an existing contract with a county after the contractor criticized the county commissioners. *Id.* at 671. Consistent with this court's analysis, the Supreme Court rejected the argument that independent contractors should not be afforded First Amendment rights along with public employees. *Id.* at 676. The Court declined to draw a bright line between employees and contractors granting First Amendment protection to employees and withholding this protection from contractors. Instead, the Court applied the *Pickering* balancing test where the interests of the government in regulating speech is balanced against the interest of the

10

contractor to First Amendment protection. So rather than withholding all First Amendment protection from contractors, the Court's approach was to use the familiar *Pickering* balancing test to accommodate the differences between employees and contractors and determine the extent of First Amendment protection that would be afforded to contractors. The seven-justice majority concluded:

> We therefore see no reason to believe that proper application of the *Pickering* balancing test cannot accommodate the differences between employees and independent contractors. There is ample reason to believe that such a nuanced approach, which recognizes the variety of interests that may arise in independent contractor cases, is superior to a bright-line rule distinguishing independent contractors from employees. The bright-line rule proposed by the Board and the dissent would give the government *carte blanche* to terminate independent contractors for exercising First Amendment rights. And that bright-line rule would leave First Amendment rights unduly dependent on whether state law labels a government service provider's contract as a contract of employment or a contract for services, a distinction which is at best a very poor proxy for the interests at stake.

*Id.* at 678-79 (citing *Political Patronage in Public Contracting*, 51 U. Chi. L.Rev. 518, 520 (1984)("[N]o legally relevant distinction exists between employees and contractors in terms of either of the government's interest in using patronage or of the employee or contractor's interest in free speech.")(other citations omitted)).

Because the underlying lawsuit involved a contractor's loss of an existing contract, the Supreme Court reserved for another day the question of whether an independent contractor with no pre-existing commercial relationship would be permitted to assert a

First Amendment retaliation claim. *Id.* at 686.[3]

The Third Circuit is the only circuit to address the question the Supreme Court reserved in *Umbehr*. *See McClintock v. Eichelberger*, 169 F.3d 812, 816-17 (3d Cir. 1999). Ten years before *Blackburn* was adopted by the Supreme Court in *Umbehr*, the Third Circuit held that independent contractors possess no right to pursue claims for First Amendment retaliation unless the contractor is able to prove the existence of a property interest. *Horn v. Kean*, 796 F.2d 668, 674 (3d Cir. 1986) (*en banc*), *overruled by Umbehr*, 518 U.S. at 673.

Even though the Supreme Court expressly overturned the reasoning of *Horn* in *Umbehr*, 518 U.S. at 673, a divided panel of the Third Circuit declined to extend *Umbehr*'s protections to independent contractors who possess no pre-existing contractual relationship with the government. *McClintock*, 169 F.3d at 816-17.[4]

---

[3]The same day, the Supreme Court, in a companion opinion, extended to a corporate independent contractor the right to protection from political patronage under the First Amendment. *See O'Hare Truck Serv. Inc., v. City of Northlake*, 518 U.S. 712 (1996).

[4]There is some question as to whether the discussion of the right of a contractor without a pre-existing relationship with the government to First Amendment protection is dicta since the court first stated that the only argument the contractor made was based on having a prior relationship. *See McClintock*, 169 F.3d at 817 (stating "[w]e...will not entertain this argument as appellants did not plead it as the basis for relief in their complaint," and "[i]n any event, even if we entertained appellants' argument that without regard for their status under *Umbehr* and *O'Hare* they are entitled to relief, we would affirm.").

12

In dissent, Judge Roth criticized the *McClintock* majority for construing the *Umbehr* Court's decision not to address First Amendment retaliation suits by bidders as categorically denying claims by contractors without a pre-existing commercial relationship with the government. *Id.* at 818. Judge Roth reasoned that the Supreme Court simply did not address the issue because it was not presented in the case. As Judge Roth pointed out, nothing in the Supreme Court's opinion suggested that it would not permit retaliation claims by those without a pre-existing relationship with the government entity. Citing *Perry* and *Rutan,* Judge Roth reasoned:

> Given these holdings and the reasoning that the Court employed in reaching them, it is logical to conclude that all independent contractors fall within the standard set forth in *Umbehr*, in *O'Hare*, and in the government employee cases. The opposite inference, that this precedent should be understood to bar suits by contractors who are applicants for new contracts, is not logical. *Id.* at 820.

Judge Roth concluded that the Supreme Court's holding in *Rutan* made the inference "inescapable." *Id.* Since First Amendment rights have been afforded to individuals applying for employment with the government, no different result should be afforded to bidders applying for "employment" with the government under a bidding arrangement. *See id.*

We agree with Judge Roth's dissent in *McClintock*. Reading *Umbehr* and *Rutan* together, the Court's reasoning strongly supports

13

her conclusion that the contractor - like the individual job applicant - is protected by the First Amendment if its bid is rejected in retaliation of its exercise of protected speech.

Justice Scalia's dissent supports this reading of the majority opinion. Although he strongly disagrees with the majority's approach, he holds out no hope that in the next case, the majority will decline to extend First Amendment protection to the contractor which has no prior relationship with the government:

> The quoted statement in *Umbehr,* [reserving the question of whether contractors without a pre-existing relationship are entitled to First Amendment protection], invites the bar to believe, therefore, that the Court which declined to draw the line of First Amendment liability short of firing from government employment (*Elrod* and *Branti*), short of nonhiring for government employment (*Rutan*), short of termination of a government contract (*Umbehr*), and short of *denial* of a government contract to someone who had a "pre-existing commercial relationship with the government" (*O'Hare*) may take a firm stand against extending the Constitution into every little thing when it comes to denying a government contract to someone who had *no* "pre-existing commercial relationship." Not likely; in fact, not even believable.

*Umbehr,* 518 U.S. 668, 709, 116 S.Ct. 2361, 2373 (Scalia, J., dissenting).

For the reasons stated above, the Court's analysis in *Umbehr* leads us to conclude that the Court would not require a contractor to have a prior relationship with a governmental entity before being able to assert a First Amendment claim and the district court erred in dismissing the suit on this ground.

**III.**

14

For the reasons stated above, we conclude that plaintiff stated a claim for a First Amendment violation. We do not however express any opinion on the ultimate outcome of this case. We vacate the district court's order dismissing this suit and remand this case to the district court for further proceedings.

VACATED and REMANDED.


ENDRECORD

15

DeMOSS, Circuit Judge, dissenting:

Because the majority opinion unnecessarily expands the law in an area in which I believe we have already strayed too far from the text of the Constitution and because affirming the district court's decision would promote the resolution of Appellant-Renda's state law claims in the more appropriate state court forum, I respectfully dissent.

A.

The portion of the First Amendment of the U.S. Constitution relevant to this case reads, "Congress shall make no law . . . abridging the freedom of speech." U.S. CONST. amend. I. Although I disagree with the premise that the Fourteenth Amendment was intended to make the First Amendment applicable to the States, necessitating the transformation of the quoted text into "Neither Congress nor any State or State entity shall make any law abridging the freedom of speech," I am forced to recognize, at a minimum, this judicial interpretation. What I cannot recognize is the majority's transformation of the ten words quoted above into the following passage:

A city council of a city organized under the

laws of any State shall not deny the award of any contract for public services that is subject to competitive bidding to any corporation on the grounds that such corporation has previously filed suit against another governmental entity organized under the laws of the State alleging that such other governmental entity required the corporation to take actions contrary to local state law.

The majority deems this transformation necessary per the Supreme Court precedent it cites, but I tend to agree with Justice Scalia that the precedent is questionable, and I am dismayed that the majority feels the need to expand upon it. I also have serious doubts about the majority's treatment of the term "public concern" in the free speech context.

First, as mentioned above, the Free Speech Clause contains but ten words. The power to amend those words lies with the Congress and the States. U.S. CONST. art. V. Although I do not here go so far as to accuse the Supreme Court of usurping the power to amend, I agree with Justice Scalia that "when a practice not expressly prohibited by the text of the Bill of Rights bears the endorsement of a long tradition of open, widespread, and unchallenged use that dates back to the beginning of the

Republic, [the courts] have no proper basis for striking it down." *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 95 (1990) (Scalia, J., dissenting).

Second, neither the Supreme Court precedent cited by the majority nor any other Supreme Court case I have found has recognized a cause of action accruing in a corporation that alleges that its right to free speech has been infringed by a governmental entity. And I see no reason to continue to expand the law in the free speech context. Further, as a corporation, Renda (i) is not eligible to vote in any state or federal election; (ii) is not eligible to run for or hold any public office; (iii) is not eligible to be a member of any political party; (iv) is not eligible in Texas to make any contribution to any political candidate, and its ability to contribute funds to support a political party is severely limited; (v) cannot be an employee of any governmental entity; and (vi) is not counted as a "person" in any census, and therefore its existence has no influence on the composition of state legislative or congressional districts. While I realize that the Supreme

18

Court has recognized some sort of free speech right in corporations with respect to the promotion, advertisement, and sale of their respective products and services, I do not see any good reason, and the majority has not provided one, to expand the free speech right of corporations in this context where even the Supreme Court has yet to do so.

Third, whatever the controversy between the El Paso Water District, Renda, and the City of Socorro was, I am convinced it was not a matter of public concern to the citizens of Lubbock County, some 450 miles away from El Paso County. In this vein, I note that Renda's home office is in the suburbs of Dallas/Forth Worth in Denton County, some 300 miles from Lubbock County and in the opposite direction from El Paso County.

Again, expansion of free speech rights in this case is inappropriate because we have already lost sight of the text of the Free Speech Clause; corporations have not previously been given the same broad free speech protection as individuals; and the notion of "public concern" is here stretched beyond recognition.

19

B.

I also dissent because I am bothered by the effect of the majority's decision on the course of the litigation between Renda and the City of Lubbock. I believe that affirming rather than reversing Judge Cummings's decision would better serve the interest of federalism in providing the best forum for the resolution of the real controversy between Renda and the City of Lubbock. It appears from the pleadings and Judge Cummings's statement of the facts that the dollar amount of Renda's bid was less than the dollar amount of the winning bid. Under Texas law, a city contract for a civil engineering construction project must be awarded to the "lowest responsible bidder." TEX. LOCAL GOV'T CODE § 252.043(d)(1). To me, the real controversy in this case is whether the City of Lubbock met that obligation; and that issue should be decided in state court, where the court would be best able to determine, under Texas law, the scope of the City's discretion in determining which bidders qualify as "responsible" bidders.

For the foregoing reasons, I would affirm the

decision of the district court.