# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 21, 2009

Charles R. Fulbruge III
Clerk

No. 08-10481

OSCAR RENDA CONTRACTING INC.; JOHN C. BECK

Plaintiffs-Appellants

v.

THE CITY OF LUBBOCK, TEXAS; DAVID MILLER, in his official
capacity as Mayor for injunctive relief

Defendants-Appellees

Appeal from the United States District Court
for the Northern District of Texas

Before HIGGINBOTHAM, GARZA, and PRADO, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

The plaintiffs-appellants Oscar Renda Contracting, Inc., and John C. Beck, appeal the district court's grant of summary judgment against their claims against the City of Lubbock, Texas. Renda claims that Lubbock violated its constitutional right of free speech in denying it a construction contract; Renda joins the claim of Beck, a Lubbock taxpayer, that Lubbock's failure to award the contract to Renda unlawfully deprived taxpayers of the benefit of Renda's lower bid in violation of the Texas Local Government Code.

I

The "South Lubbock Drainage Project - Package #1 Main Trunk Line" involved the installation of approximately ten miles of pipe at depths of up to forty-five feet, improving the city's storm water drainage. The Lubbock city council considered it a high profile project, requiring attention to safety as well as adroit coordination of construction activities with environmental and regulatory authorities, affected landowners, and the public. The council set a budget and solicited bids from contractors pursuant to Texas law. Under this law, the council was obliged to select a winning bid from the "lowest responsible bidder or . . . the bidder who provides goods or services at the best value for the municipality," basing the assessment on enumerated factors, including price, reputation, and quality.[1]

Renda is a contractor based in Roanoke, Texas. Its bid on the South Lubbock Drainage Improvement Project of $23.5 million undercut the next lowest contractor, Utility Contractors of America, by $2.2 million.

In order to determine whether Lubbock should accept Renda's offer, Lubbock's City Utility Engineer Marsha Reed began an investigation into Renda, using information provided in its bid form as well as public records. She made inquiry with organizations that had dealt with Renda. They offered mixed reports on Renda's performance. An August 13, 2004, memorandum to Lubbock's mayor and city council discussed the issue and summarized the information she had received about Renda and the next-highest bidder, Utility Contractors of America. Utility Contractors fared much better in every category of concern that the inquiry forms addressed. Among other problems with

---

[1] Tex. Loc. Gov't Code Ann. § 252.043 (Vernon 2007).

Renda's history, Reed specifically cited a contract dispute in Arlington, Texas, resulting in a lawsuit initiated by Renda, and an action brought by the Occupational Safety and Health Administration against Renda for alleged safety violations. Her memo mentioned no other litigation. She emphasized "serious safety and environmental concerns and public relations concerns," noting that "there will be City employees down in these trenches and in the pipe not to mention the amount of public contact involved with this project." By contrast, she pointed out that her research into Utility Contractors found "a much better track record in working with the public and there were no safety or environmental issues cites by any of their references."

In a chart attached to her report, out of a total of forty-seven boxes with responses concerning Renda, many of them tepid at best, only one box referenced the lawsuit against the El Paso Municipal Utility District that Renda now argues was the grounds for Lubbock's unconstitutional retaliation against it. Reporting information apparently from El Paso officials, the box indicates that "[Renda was v]ery lawsuit happy—Sued water district for $4 mill on a $6 mill project." Another box reports from a different Renda customer: "Has both positives and negatives about them. Owner has been threatened with lawsuits several times during job when things did not go their way." Two other boxes, neither apparently reporting El Paso feedback, answer the questions "Were there any claims? Were they justified?" with "Differing conditions claim," and "Yes—pending." Only one out of four boxes with answer to these questions said "no." By contrast, all four of Utility Contractors' respondents answered "no" to

this query about litigiousness and construction problem-solving.[2] As noted, this was only one of many areas of information sought about the project bidders, and only one area of concern about Renda that would naturally arise from a perusal of the feedback chart.

A follow-up memo from Reed reiterates safety and environmental concerns as well as "community concerns over traffic control and access." The memo recounts a September 16, 2004, meeting in which Renda sought to reassure the city as to some of the safety concerns, but the memo notes that Lubbock's research suggested that Renda was "not completely honest with us in our meeting when specifically asked about th[e] issue" of whether it bore some responsibility for fines issued by the Texas Commission on Environmental Quality on a project. Ultimately, Reed concludes that while she "still has reservations," her "final recommendation" is that Renda should be awarded the contract. She conditions this finding on Renda's executing an affidavit affirming its understanding of a number of the contractual terms and Lubbock's expectations. The affidavit emphasizes the agreed-upon contingencies for cost overruns, the necessity of safety and regulatory compliance, and Renda's performance of due diligence in preparing the project.

Despite the recommendation and the affidavit, the city council decided at its September 28 meeting to award the contract to Utility Contractors instead of Renda, by a narrow 4-3 majority. Discussion focused on reputation, safety, and reliability concerns,[3] and on whether doubts about Renda could justify

[2] Renda subsequently introduced letters from numerous parties affirming Renda's trustworthiness and capability in order to counter this initial negative feedback.

[3] Councilmember Tom Martin stated that "considering the experience, manpower, equipment, supervisory abilities, business judgment, efficiency, reliability, reputation, safety

spending over $2 million more on the project. Although not discussed in any detail, Renda's possible litigiousness came up as well,[4] with the council focused on the fact that it was already having to contend with a $2.5 million contract dispute on an unrelated project.[5]

---

record, and capacity to perform the work of the bidders," he supported Utility Contractors.

Councilmember Jim Gilbreath, who ultimately voted for Renda, noted: "In some cities, it is my understanding that some of the cities for whom they had done work had some 'heartburn' in terms of safety record, change orders, just a multitude of different issues. . . . However, in doing some checking with maybe, management in those cities, you found that they were recommending the same company."

[4] The comments benefit from being read in context:

City council member Martin: [H]ave you—have you had any prior experience with either of these companies?

[Lubbock purchasing official, Fox:] When with the City of San Antonio, the Renda Contracting Company had several projects with the San Antonio water system, and in making reference checks, it was pointed out to me, in my memory, there were several change orders that were proposed during those particular contracts. But when I asked people if I could use their names or they would send a letter affirming that, they refused.

Martin: Do you think that's because they wouldn't stand up to what they said or their reluctance to possibly get sued? I mean it's kind of like the old game about doing employment reference checks anymore. You have a hard time getting anybody to tell you the truth, because the first thing they think of is somebody, like a bidder in this case, threatening suits all the time. Would you say that that had anything to do with it?

Fox: I think it did. yes. And I would suggest that if awarded this contract, Renda Contracting will be carefully monitored, and there won't be any change orders; unreasonable change orders.

Martin: Even if they threaten to sue?

Fox: They'll have a tough time doing business in Texas, once the word gets out.

[Council member Boren:] I think the word's already starting to get out from what we heard on our reference checks.

[5] Just after the discussion supra, the council turned to the pending litigation. A representative section:

Martin: One final question, Marsha. We—this is the second big storm sewer project in the south part of the city, is that correct?

One month later, Renda was back before the council, attempting to convince it to change its mind. Its effort did not take a form likely to persuade that it was not litigious. Rather the opposite, as Renda made it a point to lift up the El Paso suit in a thinly disguised effort to infect the award decision. In the hearing, Renda's representatives, including its lawyer Terry Salazar, attacked the council's decision not to award the job to Renda and attempted to plant public seeds to aid a retaliation claim. A representative of Renda announced:

> I want to just make sure this goes on the record, that we know the decision that was made by the majority was against the law. We know, we've been told and informed by the City staff, that the motivating factor was this lawsuit out in El Paso; but we gave you a copy of that. So you know that your motivating factor was a lawsuit that they filed to address a violation of their first amendment [sic]. You can't use that to hold against them, and yet you do.

This was the first mention of the El Paso suit in the council's proceedings and came after the council had awarded the contract to Renda's competitor. The representative went on to warn the council that its actions would "end up costing Lubbock" five million dollars, apparently suggesting that this would be the sum of the litigation costs and lost-profit damages that would be owed Renda. Councilmember Martin countered the Renda version of events by reasserting

---

Reed: Yes, sir.
Martin: And do we have a law suit pending in that case, where the contractor sued us for additional money?
Reed: Yes, sir. We do.
Martin: And what was the—do you know roughly, what the amount of that is?
Reed: It's about two and a half million dollars. All total.
Martin: Okay. So, we already have one suit where we had another out-of-town contractor that came in here and now they're suing us for $2.5m that they think we owe them extra.

that the decision was lawful and emerged from an informed view that "Renda is not a responsible bidder." He cited much of the material discussed above and offered no comment on Trusevich's accusations regarding the El Paso litigation. The council affirmed its initial vote.

Less than a month later, Renda brought suit against Lubbock and its officials in state court, but when that court refused to grant a temporary restraining order, it nonsuited that action and filed suit in the United States District Court for the Northern District of Texas, alleging constitutional and state statutory violations and seeking damages and attorney's fees in addition to declaratory and injunctive relief.

After the district judge dismissed the federal law matters for failure to state a claim and declined to exercise supplemental jurisdiction over the Texas claims, this court reversed and remanded, holding that Renda had stated a First Amendment claim.[6] Back before the district court, Lubbock sought summary judgment, which the district court granted on April 18, 2008. Renda timely appealed.

II

Renda argues that Lubbock retaliated against it because of its previous litigation against the El Paso County Lower Valley Water District.[7] It characterizes this litigation as constitutionally protected speech on matters of public concern. The El Paso dispute initially emerged, according to Renda, from

---

[6] *Oscar Renda Contracting, Inc. v. City of Lubbock*, 463 F.3d 378 (5th Cir. 2006).

[7] *El Paso County Lower Valley Water Dist. v. Oscar Renda Contracting, Inc.*, 2004 WL 1637990 (Tex. App. 2004).

its refusal to disregard code requirements for asphalt installation in a major pipe-laying project designed to provide water and waste water services to the City of Socorro, Texas. Allegedly, Water District authorities, via their engineering team, instructed Renda to use a less expensive method of laying asphalt instead of the "hot mix asphalt concrete" (HMAC) required by ordinance. At a meeting which Socorro city representatives attended, Renda requested extra funding for the HMAC method, but the design engineers for the Water District insisted on the less expensive method—and, according to Renda's complaint, "accused Renda and Socorro of making secret deals between each other." The contract it had signed with Renda provided that this re-paving would replicate the surface originally present, which was apparently the surface the engineers ordered. The contract also provided that the Water District would pay for changes under the contract if notified that there was a conflict with regulations. As the dispute unfolded, delays and expenses multiplied, some of them only distantly related to the asphalt issue. Renda ultimately brought suit in state court, alleging that the Water District retaliated against it, in violation of its First Amendment Free Speech rights, when it "(1) spoke out against violations [of] the City of Socorro's laws and regulations concerning paving, and/or (2) opposed discrimination by reporting [the design engineering firm's] racially motivated remarks and actions to the El Paso Lower Valley Water District . . . ."[8] The jury found against Renda on both components of its

---

[8] No document introduced by Renda adds any detail to its Second Amended Petition's allegations. At Renda's request the judge described this claim to the jury as follows: "The District, by and through its inspectors and engineers, labeled Renda's workers as incompetent. Renda spoke out against the discriminatory statements relating to the minority workers which were hired by Renda." To this day, and even after scouring the record on appeal, the contours of the Water District litigation remain murky, aside from the strictly contractual matters dealt

8

retaliation claim. Renda also brought a breach of contract claim, for which it won damages of four million dollars. The Water District appealed the verdict.

The most readily available public document concerning the Water District litigation, the Court of Appeals of Texas decision, discusses the nature and validity of the contract dispute in considerable detail, making fleeting reference to Renda's constitutional claims, which were apparently not appealed. The opinion makes mention of the origin of the dispute in a possible violation of city ordinance, but clearly, numerous hotly disputed issues were construction and contract related issues going far beyond issues of code compliance or any disparaging or discriminatory remarks.

We put aside that issues of code compliance are the common fodder of construction litigation and accept, arguendo, Renda's argument that disputes over applicable codes in the course of construction are matters of public concern; we also acknowledge that a claim that racially-motivated statements by government agents even when found to be meritless is as well. Nonetheless, matters of public concern even by this generous reach played a relatively minor role in the Water District suit, at least as it appears in any widely-available record. And, if there is to be any meaning to the principle that not all construction contract disputes involving government entities or agents are matters of public concern, then much of the El Paso suit fails to register as such.[9]

---

with by the appeals court, which described and decided only the contract dispute appeal before it.

[9] The scope of matters of public concern in this context is generally broad, and does not primarily depend on the motives of the speaker, rather the public interest of the speech itself. Generally, "the test is whether the information . . . was 'relevan[t] to the public's evaluation of the performance of governmental agencies.'" *Davis v. Ector County*, 40 F.3d 777, 783 (5th Cir. 1994) (*quoting Couglin v. Lee*, 946 F.2d 1152, 1157 (5th Cir. 1991)) (alteration in original).

Of further concern is the fact that, although the Lubbock decision is here at issue, Renda has failed to present any competent evidence that Lubbock decisionmakers were at a relevant time aware that the El Paso litigation had any claims later claimed to be protected by the First Amendment. Indeed, even in retrospect and upon focused consideration on appeal, given the vagueness and obscurity of the court documents relating to the El Paso proceedings it is difficult to ascertain their contours, and even at their height they appear to be notably less substantial ones than most of those protected in the leading First Amendment cases.[10] We do not hold that failure of the El Paso constitutional claims removed the suit from the scope of protected matters of constitutional concern, nor do we hold that matters of public concern mixed with mundane contract matters cannot form a basis for a First Amendment retaliation claim. Rather, we reject the further argument that the mere inclusion of unsuccessful constitutional claims in a broad-ranging complaint ipso facto illuminates every corner of an intricate contract dispute with a constitutional glow, visible from El Paso all the way to Lubbock.[11]

---

*See generally id*. at 781-83 (discussing benefits of stimulating comment on matters of public concern and ambit of constitutional protections); *Kinney v. Weaver*, 367 F.3d 337, 361-62 (5th Cir. 2004) (en banc) (discussing importance of First Amendment protection for speech about official misconduct). Of course, the Supreme Court has instructed that the position and role of the speaker is relevant as well, but this doctrine is not invoked here. *See Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Jordan v. Ector County*, 516 F.3d 290 (5th Cir. 2008); *Charles v. Grief*, 522 F.3d 508, 514-15 (5th Cir. 2008); *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 692-93 (5th Cir. 2007); *Rathjen v. Litchfield*, 878 F.2d 836, 841-42 (5th Cir. 1989).

[10] *See, e.g., Garcetti*, 547 U.S. at 413-14; *Davis v. McKinney*, 518 F.3d 304, 314-17 (5th Cir. 2008); *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205*, 391 U.S. 563 (1968).

[11] Nor do we suggest that our colleagues who examined this case at the 12(b)(6) stage erred in their resolution of the issues presented at that point, including the legal issue of whether a suit based on matters of public concern in El Paso could protect Renda from

The tension is between the public interest in open and robust debate on issues of the day and the governmental interest in good stewardship when participating in economic activities, including as an employer. "The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer."[12] The Supreme Court has outlined a multi-part test of claims in this difficult arena. "To state a First Amendment retaliation claim, an employee suing his employer must establish four elements: (1) the employee must suffer an adverse employment decision; (2) the employee's speech must involve a matter of public concern; (3) the employee's interest in commenting on matters of public concern must outweigh the defendant's interest in promoting efficiency; and (4) the employee's speech must have motivated the employer's adverse action."[13] The Supreme Court has applied this doctrine to contractors as employees.[14] Even if these elements are met, the employer can respond, invoking the "*Mt. Healthy* doctrine," and demonstrate to a preponderance that "it would have reached the same decision as to respondent's []employment even in the absence of the protected conduct."[15]

---

retaliatory action in Lubbock. *Oscar Renda*, 463 F.3d at 382-83.

[12] *Waters v. Churchill*, 511 U.S. 661, 675 (1994) (O'Connor, J., for the plurality).

[13] *Oscar Renda*, 463 F.3d at 382 (emphasis removed).

[14] The previous panel of this court addressing this case determined that Renda's suit could not be prevented merely because it lacked a pre-existing relationship with Lubbock. *Id.* at 383-86.

[15] *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Jordan*, 516 F.3d at 301.

We have examined the record of Lubbock's decisionmaking,[16] but cannot find a genuine issue of material fact. Deposition testimony and other evidence in the record establishes that Renda's litigious reputation was founded on more than the El Paso suit,[17] and as for the El Paso suit's alleged importance to the Lubbock decisionmakers, the record is devoid of any evidence of any specific interest in the El Paso suit, aside from the vaguest of statements provided by Renda's witnesses.[18] There is, significantly, no evidence that Lubbock knew or

---

[16] Lubbock's efficient decisionmaking process and reasonable beliefs are relevant to the test we here apply. As our court has stated: "[T]he Supreme Court's *Waters v. Churchill* decision held that, when a plaintiff-employee's First Amendment retaliation claim rests on a disputed version of his speech, a court applying the Supreme Court's *Connick v. Myers* test to determine whether the speech was on a matter of public concern must examine the speech as the defendant-employer reasonably believed it to be." *Salge v. Edna Indep. Sch. Dist.*, 411 F.3d 178, 185 (5th Cir. 2005) (footnotes omitted) (*citing Waters*, 511 U.S.).

[17] In addition to the evidence cited in the section above, there is, for instance, the testimony of Rudy and Oscar Renda, in which they acknowledge Renda's and related companies' involvement in several suits against numerous cities and municipal entities, in addition to the El Paso suit.

[18] Rudy Renda, for instance, refused even to directly state his grounds for believing that the El Paso litigation was of particular importance to Lubbock decisionmakers:
Q. Mr. Renda, did Marsha Reed ever say that she was not recommending you because of the El Paso litigation?
A. In the meeting that was one of the main concerns in the matrix – there was a matrix and the lawsuit happy, there was a very – there was a very detailed.
Q. My question was: Did Marsha Reed at that meeting ever say that she was not recommending Oscar Renda because of the lawsuit in El Paso?
A. There was discussion that they had a concern about that.
Q. Still not my question. You understand my question?
A. I can't say specifically that she did.
Q. Okay. Did Victor Kilman ever say that?
A. I don't remember if they did it outright. I would be speculating, outright said it.
Q. Or did any of the other members there, Mr. Casner or anyone else from the city say that?
A. Not that I remember.

even could have been likely to discover that there were constitutionally protected dimensions to the Water District litigation. The lack of knowledge might not be dispositive in all circumstances, but here, where there is ample evidence that the Water District litigation involved a large damage award derived largely or solely from disagreements that were *not* of public concern, and there is no evidence that Lubbock had any inkling of the claim now put forward as a matter of public concern in that litigation at all, no reasonable juror could find that Lubbock officials retaliated against Renda for its exercise of constitutional rights. Lubbock's decision only partly depended on Renda's reputation for litigiousness; Renda's reputation for litigiousness only partly emerged from the El Paso litigation; and the El Paso litigation only partly involved issues of public concern. By the end of this chain, the First Amendment values dim to vanishing. Whether cast as a matter of Lubbock's efficient decisionmaking outweighing Renda's First Amendment interests, of the utter lack of showing that constitutional speech was a significant or motivating factor, or of Lubbock's successful invocation of the *Mt. Healthy* defense, the connection between the Lubbock decision and any protected constitutional claims in the El Paso litigation is simply too attenuated to take to a jury.

There was no showing, in other words, of more than the fact that frequent litigation was a substantial or motivating factor in rejecting the bid. That a part of one of the suits involved public issues is not alone on this record sufficient to show that protected activity was a substantial or motivating factor in Lubbock's conduct. As the Supreme Court put it, "[a]n employee who makes an unprotected statement is not immunized from discipline by the fact that this

13

statement is surrounded by protected statements."[19] Renda has not raised a fact issue as to retaliation. The most able of advocates can only do so much with the record of a case. And while all that could be has been wrung from the record here—it cannot ultimately persuade.

## III

The parties have agreed that the Texas law claims cannot stand if the federal claims are meritless, as we now hold they are. We therefore need not dwell further on the Texas law claim.

We AFFIRM the judgment of the district court.

---

[19] *Waters*, 511 U.S. at 681.